# Supreme Court of Florida

_____

No. SC13-2092
_____

**CLEMENTE JAVIER AGUIRRE-JARQUIN**,
Appellant,

vs.

**STATE OF FLORIDA**,
Appellee.

_____

No. SC14-1332
_____

**CLEMENTE JAVIER AGUIRRE-JARQUIN**,
Petitioner,

vs.

**JULIE L. JONES, etc.**,
Respondent.

[October 27, 2016]

PER CURIAM.

Clemente Javier Aguirre-Jarquin ("Aguirre") appeals the denial of his

motions to vacate his conviction of first-degree murder and sentence of death filed

under Florida Rule of Criminal Procedure 3.851, and he also petitions this Court

for a writ of habeas corpus.[1]

## I. BACKGROUND

In 2006, Aguirre was convicted and sentenced to death for the 2004 murders

of Cheryl Williams and Carol Bareis, who were stabbed to death in their home.

Aguirre-Jarquin v. State, 9 So. 3d 593 (Fla. 2009). In its opinion in Aguirre's

direct appeal, this Court explained the evidence presented at trial as follows:

> Aguirre was born in Honduras in 1980 and came to the United
> States in March of 2003. . . .
> At the time of the murders, Aguirre [lived at 117 Vagabond
> Way in a trailer park in Seminole County and] worked at a restaurant
> as a dishwasher and a prep cook. One of his duties was washing the
> knives. . . .
> The victims, Cheryl Williams and Carol Bareis, lived next door
> to Aguirre. Carol was Cheryl's mother. Cheryl's daughter, Samantha
> Williams, lived with her mother and grandmother. Carol was a stroke
> victim, partially paralyzed, and spent most of her time in a wheelchair.
> Aguirre was an acquaintance of his neighbors and occasionally
> visited with them socially. Samantha testified that several months
> before the murders she awoke at 2 a.m., and Aguirre was standing
> over her bed. She screamed at him and forcefully told him to leave.
> Samantha escorted Aguirre out the front door and locked the door
> behind him. The next day she reiterated that he was not to enter their
> residence at night without permission.
> On the night of June 16, 2004, Mark Van Sandt, who was in a
> relationship with Samantha, went to 121 Vagabond Way to visit
> Samantha. He arrived at the residence around 7:30 p.m. and stayed
> until approximately 11:30 p.m. Samantha decided to leave with Mark
> and stay at his parents' house that night. When Samantha and Mark

---

1. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.

left the residence at 121 Vagabond Way, both Cheryl and Carol were inside and alive.

Samantha was scheduled to work the next day, so Mark agreed to go back to her house and pick up her work clothes. Mark left his house around 8:45 a.m. on June 17, 2004, and drove to 121 Vagabond Way. When Mark arrived at 121 Vagabond Way, he went to the front door, which was almost always left unlocked, and attempted to open the door. However, he was unable to fully open the door because Cheryl Williams' body was blocking the entryway. Mark squeezed his way through the door and called 911.

Deputy Pensa of the Seminole County Sheriff's Department was the first law enforcement officer to arrive. Deputy Pensa forcibly entered through the back door. Subsequently, two other officers, Bates and Miller, arrived at the scene. Pensa and Bates noticed blood on the floor. The officers located Cheryl's body, which blocked the front door. Thereafter, deputy Pensa found Carol lying dead on the floor in the living room. She was lying face down in a pool of blood next to her wheelchair.

One of the crime scene analysts found a ten-inch chef's knife while searching the property. The knife was found between Aguirre's residence and the victims' residence. The knife was the same make and model used at Aguirre's place of employment. After speaking with the head chef at the restaurant where Aguirre worked, law enforcement officers determined that a ten-inch chef's knife was missing from the restaurant.[FN]

> [FN.] Aguirre's roommates also stated that the knife was similar to one that had been at their residence, which was also missing. Samantha Williams testified that her family did not own a knife of that type.

At approximately 11 a.m. on June 17, deputies knocked on the door of 117 Vagabond Way and asked Aguirre and his two roommates if they knew anything about what happened next door. Aguirre told the officers he did not know there was a problem next door. Later that same day, Aguirre approached law enforcement officers and told them that he had information about what occurred next door. He told the officers that he went into the home and saw that Cheryl was dead. However, at this point, Aguirre told them that he only knew of Cheryl's death. After Aguirre's conversations with police, he was arrested for tampering with evidence from a crime scene. Subsequently, Aguirre was indicted for murder.

During the course of the trial, various law enforcement personnel, physicians, and experts testified to the evidence at the crime scene and the victims' wounds. Cheryl had been stabbed 129 times. She had severe wounds to her lungs and leg, one of which severed her femoral artery. She also had numerous defensive wounds on her hands and feet that indicated an extremely violent struggle for her life. She was stabbed in the arms, legs, back, hands, feet, and chest. One stab wound to her left lung was considered fatal. There was an extensive amount of evidence in the area of the house where Cheryl was found, including a great deal of blood on the floor, walls, and door in the area of Cheryl's body.

Carol suffered two stab wounds. The fatal stab wound went directly into her chest and severed her left ventricle, and the other stab wound was to her back. . . .

All of the stab wounds sustained by Cheryl and Carol were consistent with being caused by the chef's knife found between the victims' residence and Aguirre's residence. The knife contained Cheryl's blood on the handle and Carol's blood on the blade, indicating that Cheryl was killed first.

A crime scene analyst testified that there were 67 bloody shoe impressions found inside the victims' residence. Of the 64 impressions that were comparable, all 64 were consistent with the footwear of Aguirre. The soles of his shoes contained Cheryl's blood. Law enforcement officers obtained a search warrant for the property at 117 Vagabond Street and retrieved the bag of clothes. Aguirre's underwear, socks, T-shirt, and shorts contained Cheryl's blood. Further, Aguirre's T-shirt, shorts, and underwear contained Carol's blood and DNA.

A Florida Department of Law Enforcement (FDLE) bloodstain pattern analyst also examined Aguirre's clothing. Aguirre's shorts had contact stains on both the front and back. The back of his shorts also had bloodstains that were not contact stains but arrived on his shorts through some type of motion, either impact spatter or cast off. His socks had contact stains as well as spots that were "consistent with dropped blood."

According to Aguirre's testimony during the guilt phase, he had the day before the murders off from work so he began drinking early. He and his friends continued to drink throughout the day and night. Aguirre returned back to 117 Vagabond Way at approximately 5 a.m. on the morning of the murders.

Aguirre stated that he watched television and then got up to look for beer. There was no beer in his trailer so he walked next door. He attempted to go inside, but Cheryl's body was blocking the door. However, he managed to make it inside, and he lifted Cheryl's body on to his lap and tried to revive her. He realized she was dead so he put her back on the floor where he found her. Aguirre then walked toward the living room where Carol spent the majority of her time and found her dead as well. While in the house, Aguirre noticed the murder weapon sitting on a box near where Cheryl was lying. He stated that he feared the killer was still inside the house; therefore, he picked up the knife and screamed, "Is anybody here?" There was no reply. He then walked to Samantha's room. She was not there, but her room had been ransacked.

Thereafter, Aguirre ran outside towards his residence and tossed the knife into the grass. He then stripped off all his clothes, placed them in a plastic bag, set the bag on top of his shed, and bathed. Aguirre initially planned to burn the clothes. He explained that he did not call police and report the murders because he was an illegal immigrant and afraid of deportation.

Id. at 598-600 (two footnotes omitted).

Aguirre's jury convicted him of two counts of first-degree murder and one count of burglary with an assault or battery. Id. at 600. Following the penalty phase presentation, the jury recommended the death sentence for the murder of Cheryl Williams by a vote of 7 to 5 and recommended the death sentence for the murder of Carol Bareis by a vote of 9 to 3. Id. After holding a Spencer[2] hearing, the trial court sentenced Aguirre to two death sentences in accordance with the jury's recommendations, finding that the aggravating circumstances outweighed

_____

2. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

the mitigating circumstances.[3] Id. The trial court also sentenced Aguirre to life in prison for the burglary count.

This Court affirmed Aguirre's convictions and sentences on direct appeal.[4] Id. at 597. Thereafter, the United States Supreme Court denied Aguirre's petition for a writ of certiorari. Agui[r]re-Jarquin v. Florida, 559 U.S. 942 (2010).

_____

3. For the murder of Cheryl Williams, the trial court found the following aggravators: (1) the defendant was previously convicted of another capital felony—i.e., Carol's murder (moderate weight); (2) the capital felony was committed while the defendant was engaged in the commission of a burglary (moderate, but less than great weight); and (3) the capital felony was especially heinous, atrocious, or cruel (great weight). Aguirre-Jarquin, 9 So. 3d at 600 n.6. For the murder of Carol Bareis, the trial court found the following aggravators: (1) the defendant was previously convicted of another capital felony—i.e., Cheryl's murder (great weight); (2) the capital felony was committed while the defendant was engaged in the commission of a burglary (moderate, but less than great weight); (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest (great weight); (4) the capital felony was especially heinous, atrocious, or cruel (great weight); and (5) the victim of the capital felony was particularly vulnerable due to advanced age or disability (great weight). Id.

The trial court found the following statutory mitigating circumstances: (1) under the influence of extreme mental or emotional disturbance (moderate weight); (2) substantially impaired ability to appreciate the criminality of his conduct (moderate weight); and (3) age (24) (little weight). Id. In addition, the trial court found the following nonstatutory mitigating circumstances: (1) long term substance abuse problem (moderate weight); (2) dysfunctional family setting (little weight); (3) childhood abuse (little weight); (4) poor performance in school (little weight); and (5) brain damage from substance abuse (moderate weight). Id.

4. Aguirre raised the following claims on direct appeal:

(A) the trial court erred in conducting the Faretta[v. California, 422 U.S. 806 (1975),] colloquy and requiring Aguirre to proceed with counsel; (B) the trial court erred in denying Aguirre's motion for a

In 2011, Aguirre filed his initial 3.851 postconviction motion, raising (among other claims) that trial counsel was ineffective for failing to investigate alternate suspects, including Samantha Williams. Subsequently, Aguirre amended his initial postconviction motion multiple times, adding additional allegations regarding Samantha as an alternative suspect, including (after DNA testing) that multiple bloodstains containing Samantha's DNA (but not Aguirre's) were found at the crime scene near the victims' blood, and that Samantha had stated that demons made her kill her family. Following an evidentiary hearing, the circuit court denied relief on all claims, and Aguirre appealed to this Court.

While Aguirre's appeal of the denial of his initial postconviction motion was pending in this Court, in 2014, Aguirre filed a successive postconviction motion in

---

new trial based on newly discovered evidence [that FDLE's print work on the murder weapon was inconclusive rather than a match to Aguirre]; (C) the trial court abused its discretion in denying Aguirre's for-cause challenge of a juror; (D) the trial court erred in denying Aguirre's motion for judgment of acquittal on the burglary charge; (E) the trial court erred in allowing Samantha Williams' testimony regarding Aguirre's prior uninvited entry into the victims' home; (F) the trial court erred in instructing the jury on the cold, calculated, and premeditated aggravator; (G) the trial court erred in finding that the murder of Carol Bareis was committed to eliminate her as a witness; (H) the trial court erred in finding that the murder of Carol Bareis was heinous, atrocious, or cruel.

Id. at 600-01. In addition, Aguirre argued that Florida's death sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002), that the bare majority vote for death is unconstitutional, and that the standard jury instructions for capital cases are unconstitutional. Id. at 601 n.8.

the circuit court alleging that he is entitled to a new trial based upon newly discovered evidence regarding Samantha that first came to light during the initial postconviction evidentiary hearing and that was developed after the close of evidence in that proceeding, namely affidavits from several other individuals stating that Samantha told them that she killed her mother and grandmother. This Court relinquished jurisdiction for the circuit court to hold an evidentiary hearing and consider whether the cumulative effect of the newly discovered evidence requires a new trial. Following the evidentiary hearing, the circuit court denied Aguirre's successive motion.

In so ruling, the circuit court concluded that Aguirre's successive postconviction motion constituted an abuse of process because, in the court's view, Aguirre should have sought leave to amend his initial postconviction motion to address the additional statements in which Samantha admitted to killing her mother and grandmother. However, the circuit court also addressed the merits, ruling that Samantha's statements are inadmissible hearsay and that her statements also fail to satisfy the requirements of Chambers v. Mississippi, 410 U.S. 284 (1973), for admitting a third-party's hearsay confession. Alternatively, the circuit court concluded that, "[e]ven if the various statements made by Samantha Williams were found to be admissible, when viewed in light of all the evidence presented at the evidentiary hearing during the [initial postconviction] proceedings and the

evidence presented at trial, they are not likely to produce an acquittal." In support of its ruling, the circuit court found that Samantha's statements are either "more in line with expressions of survivor's guilt than expressions of guilt [for] murder[]," or "more likely attempts to frighten individuals who had upset her rather than true confessions to the crimes." The circuit court also accepted the testimony of the State's experts that the forensic evidence is inconsistent with Aguirre's claim that he found the victims' bodies over the testimony of Aguirre's postconviction experts that the evidence is consistent with Aguirre's claim. The circuit court further concluded that none of the evidence weakened Samantha's alibi, which was provided by Samantha's then-boyfriend who testified that Samantha was asleep with him at his parents' home, but also acknowledged that he was "dead to the world" asleep most of the night.

Aguirre raises four issues in his appeal of the denial of his initial and successive postconviction motions, including that the cumulative effect of the newly discovered evidence requires a new trial. In addition, he petitions this Court for a writ of habeas corpus. We agree with Aguirre that the cumulative effect of the newly discovered evidence requires a new trial and therefore limit our review to that dispositive issue.

## II. ANALYSIS

This Court has explained that the following two requirements must be met to set aside a conviction on the basis of newly discovered evidence:

> First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. See Jones v. State, 709 So. 2d 512, 521 (Fla. 1998) (Jones II). Newly discovered evidence satisfies the second prong of the Jones II test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Jones II, 709 So. 2d at 526 (quoting Jones v. State, 678 So. 2d 309, 315 (Fla. 1996)).

Marek v. State, 14 So. 3d 985, 990 (Fla. 2009).

Because there is no dispute that the DNA evidence and confessions at issue in Aguirre's case are newly discovered evidence within the meaning of the first prong, the only question is whether this evidence satisfies the second prong. In evaluating whether the second prong is satisfied, this Court has explained that

> [i]n determining whether the evidence compels a new trial, the postconviction court must "consider all newly discovered evidence which would be admissible" and must "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." [Jones v. State, 591 So. 2d 911, 916 (Fla. 1991) (Jones I)]. This determination includes
>> whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether this evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.

Jones II, 709 So. 2d at 521 (citations omitted).

Id.; see also Jones II, 709 So. 2d at 522 ("Because this appeal involves a second evidentiary hearing in which claims of newly discovered evidence were presented and evaluated by a trial judge, we must evaluate all the admissible newly discovered evidence at this hearing in conjunction with newly discovered evidence at the prior evidentiary hearing and then compare it with the evidence that was introduced at trial."); Swafford v. State, 125 So. 3d 760, 775-76 (Fla. 2013) ("The Jones standard requires that, in considering the effect of the newly discovered evidence, we consider all of the admissible evidence that could be introduced at a new trial. In determining the impact of the newly discovered evidence, the Court must conduct a cumulative analysis of all the evidence so that there is a 'total picture' of the case and 'all the circumstances of the case.' " (quoting Armstrong v. State, 642 So. 2d 730, 735 (Fla. 1994))).

Further, when, as in Aguirre's case, the circuit court rules on a newly discovered evidence claim after an evidentiary hearing, this Court "review[s] the trial court's findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence." Green v. State, 975 So. 2d 1090, 1100 (Fla. 2008). This Court "review[s] the trial court's application of the law to the facts de novo." Id.

Applying the applicable Jones II standard to Aguirre's case, we cannot agree with the circuit court's conclusion that the newly discovered evidence does not compel a new trial. Rather, when compared to the evidence introduced at trial, the newly discovered evidence placing Samantha's blood (rather than Aguirre's) at critical locations of the crime scene coupled with Samantha's numerous confessions to multiple individuals that she killed the victims "weakens the case against [Aguirre] so as to give rise to a reasonable doubt as to his culpability," entitling Aguirre to a new trial. Marek, 14 So. 3d at 990 (quoting Jones v. State, 678 So. 2d 309, 315 (Fla. 1996)).

### The DNA Evidence

At the postconviction evidentiary hearing, Aguirre presented the results of DNA testing on 150 previously untested bloodstains from the crime scene. While the test results showed that Aguirre's DNA was not present, they revealed eight bloodstains that contained the DNA of someone else: Samantha Williams. These results were consistent with Aguirre's trial theory that someone else murdered the victims and bled at the scene, but the State failed to find that evidence since the State tested only the murder weapon and Aguirre's clothing.

Because Samantha also lived with the victims and testified at the postconviction evidentiary hearing that she had previously cut herself in their home, it is especially important that the eight bloodstains containing her DNA

- 12 -

were all located in areas close to the victims' blood, in high-traffic areas, or the bathroom where the State argued at trial that the killer would have cleaned up after the murders. Specifically, one of the eight bloodstains was taken from the kitchen floor, which the record shows that Cheryl had just mopped the night before the bodies were discovered. Another was taken from the living room floor, near Cheryl's blood, on the way to the southeast bathroom where the State argued the killer cleaned up after the murders. Four more were taken from the southeast bathroom—one from the door and three from the floor, within inches of Cheryl's blood. The last two were taken from the half bathroom in Samantha's southwest bedroom—one from the wall near where Samantha insisted a full-length mirror was hanging when she and Van Sandt left the house the night before the bodies were discovered, and the other from the floor, next to where the mirror was found on top of a CD containing Cheryl's blood.

### Samantha's Confessions

However, the newly discovered evidence is not limited to Samantha's blood at the crime scene. In addition, evidence presented at the postconviction evidentiary hearing establishes Samantha has confessed—on five different occasions to four different people—that she killed the victims.

Specifically, Samantha's friend, Nichole Casey, testified that she heard Samantha say, on two separate occasions in 2010, that "the demons in her head

- 13 -

made her do it," meaning "[m]ade her kill her mom . . . [a]nd her grandmother." On the second occasion, Casey testified that Samantha was crying and making "a stabbing motion towards her chest," and that Samantha told her "that the demons had made her do it" and that "she had hurt her mom." When asked, "Do you have any doubt whether or not [Samantha] told you that demons made her kill her family?" Casey answered, "No."

In addition to Samantha's two confessions to Casey, three of Samantha's former neighbors testified to three separate instances in which Samantha admitted to killing the victims. First, Samantha's former neighbor, Christine Laravuso testified that Samantha said, "I'm crazy, I'm evil, and I killed my grandmother and my mother" when Laravuso stopped Samantha from drinking directly from a liquor bottle at a March 2012 neighborhood barbeque. Second, in July 2012, Samantha told different neighbors, Marianne Laravuso and Michael Bowman, after they asked her to leave their property, that she "wasn't afraid" of them and that she had "killed [her] mom and grandma." Third, a few months later, when Marianne saw Samantha standing in her yard and asked Samantha to leave, Marianne testified that Samantha replied, "I'm not afraid of you guys . . . I killed my mom, I killed my grandmother." All three of these statements occurred in close proximity to the postconviction DNA testing.

The State first urges us not to consider Samantha's three most recent confessions on abuse-of-process grounds, arguing (as the circuit court found) that, rather than file a successive postconviction motion to address them, Aguirre should have sought leave to amend his initial postconviction motion. We decline the invitation, as evidence of these additional confessions did not surface until the evidentiary hearing on the initial postconviction motion was already underway, and it was not fully developed until well after the close of evidence. See Lukehart v. State, 70 So. 3d 503, 514-15 (Fla. 2011) (holding circuit court did not err by denying defendant's motion to amend the pleadings to conform with the evidence based upon new evidence "that did not surface until the evidentiary hearing" and stating that "[t]his claim may be properly raised in a successive motion for postconviction relief").

The State also argues (and the circuit court ruled) that Samantha's statements should not factor into our analysis because they would be inadmissible in a new trial, but that is incorrect. While Samantha's out of court confessions constitute hearsay,[5] in Chambers, 410 U.S. at 302, the United States Supreme

_____

5. These statements would not be admissible as a declaration against Samantha's penal interest because she was not unavailable as a witness. See § 90.804(2), Fla. Stat. Rather, Samantha testified at Aguirre's trial as a key witness for the State. She also testified at the evidentiary hearing on the initial postconviction motion, and the postconviction record indicates that, if Aguirre receives a new trial, the State will not pursue charges against Samantha and that she would be available to testify again.

Court explained that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." Accordingly, the Supreme Court ruled that the trial court erred by excluding, on hearsay grounds, the testimony of three witnesses that another person had admitted, on three separate occasions, to committing the murder of which the defendant was convicted. Id.

This Court has since applied Chambers to consider whether a third party's hearsay confession is admissible as substantive evidence. See, e.g., Bearden v. State, 161 So. 3d 1257, 1264 (Fla. 2015). In Bearden, this Court explained that "[t]he Supreme Court evaluated Chambers' argument in light of four factors intended to evaluate the admissibility of an out-of-court statement: (1) the confession or statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the confession or statement is corroborated by some other evidence in the case; (3) the confession or statement was self-incriminatory and unquestionably against interest; and (4) if there is any question about the truthfulness of the out-of[-]court confession or statement, the declarant must be available for cross-examination." Id. at 1265 (citing Chambers, 410 U.S. at 300-01).

Applying the four Chambers factors to Samantha's statements compels their admission. First, while Samantha's confessions that she killed her mother and

grandmother were not made shortly after the crime, they were spontaneous and not coerced, and they were made to people Samantha knew. Further, three of the statements (to Bowman and the Laravusos) were made in close proximity to the postconviction DNA testing, which Samantha knew was being conducted.

Second, DNA results revealing Samantha's blood in key areas of the crime scene corroborate her confessions. So, too, does Aguirre's insistence that he did not kill the victims, as does testimony from Aguirre's postconviction forensic experts explaining that the killer could not have been wearing Aguirre's shorts and why the footwear impressions Aguirre left at the crime scene are consistent with his story of how he found the victims' bodies. Additional corroboration also exists in the sheer number of times Samantha confessed—five separate times to four different people.

Third, Samantha's statements were plainly against her penal interest. Samantha unequivocally told Nichole Casey, Christine Laravuso, Marianne Laravuso, and Michael Bowman that she killed her mother and her grandmother.

Fourth, and finally, to the extent there is a question about the truthfulness of Samantha's statements, she is available to testify and be cross-examined. Samantha testified as a key witness for the State at Aguirre's trial, putting Aguirre in the victims' home, uninvited, prior to the murders.

Accordingly, Samantha's confessions that she killed her mother and grandmother are admissible as substantive evidence under Chambers. And they would also be admissible to impeach Samantha. See Livingston v. State, 678 So. 2d 895, 897 (Fla. 4th DCA 1996) ("Obviously, a defendant has a strong interest in discrediting a crucial state witness by showing bias, an interest in the outcome, or a possible ulterior motive for his in-court testimony."). Therefore, Samantha's confessions are properly considered in analyzing the cumulative effect of the newly discovered evidence.[6]

**The Newly Discovered Evidence Compels a New Trial**

The importance of the newly discovered evidence is plain when compared with the evidence that the State used to convict Aguirre—i.e., forensic evidence linking Aguirre to the murders and Samantha's testimony. As this Court explained in its decision on direct appeal, at trial, the State's case against Aguirre was based primarily on forensic evidence consisting of bloodstains on Aguirre's clothing and his footwear impressions at the crime scene. See, e.g., Aguirre, 9 So. 3d at 609 (explaining that, in addition to Aguirre's admission that he went "inside the

---

6. Similarly, Aguirre introduced other evidence during the postconviction evidentiary hearing that would, at minimum, be admissible to impeach Samantha. This evidence includes Baker Act records reflecting Samantha's extensive history of mental health problems, violent nature, and volatile relationship with her mother, as well as testimony from individuals who had knowledge of Samantha's strained relationship with her mother.

victims' home . . . [and] handl[ed] the murder weapon, which the evidence indicated was missing from his place of employment[, t]here is also voluminous forensic evidence linking him to the murders," including that his clothes "were covered in the victims' blood," "[h]is shorts contained blood stains that were not contact stains and could have only arrived through motion," and "[b]loody footprints found inside the home match his shoes, and the blood of one of the victims was found on the soles of his shoes").

In addition to the forensic evidence, at trial, Samantha testified as a key witness against Aguirre. It was Samantha who put Aguirre in the victims' home uninvited, testifying that once, several months prior to the murders, she woke in the middle of the night to find Aguirre standing over her bed. See id. at 606-07 ("Samantha's testimony was relevant to prove that Aguirre did not have consent to walk into the victims' home whenever he pleased. Further, her testimony rebutted Aguirre's defense that he walked into the victims' home that fateful morning looking for a beer and did not need to knock because the door was partially open."). It was also Samantha who denied that her family owned a knife like the murder weapon—a common kitchen knife that was also of the type used and reportedly missing from the restaurant where Aguirre worked. See id. at 598 n.2.

However, adding the newly discovered evidence to the picture changes the focus entirely: No longer is Aguirre the creepy figure who appears over

Samantha's bed in the middle of the night; he is now the scapegoat for her crimes. Viewed through this lens, the DNA evidence tending to exculpate Aguirre but inculpate Samantha substantially weakens the case against Aguirre. And when the DNA evidence is considered together with Samantha's numerous, unequivocal confessions, the result is reasonable doubt as to Aguirre's culpability.

However, the State would have us assuage this doubt by accepting the circuit court's conclusion that Samantha is a troubled young woman with survivor's guilt over her mother and grandmother's murders, crimes to which she is prone to confessing when she is either upset or threatening others. The State would further have us accept (as did the circuit court) its experts' opinions that the forensic evidence is inconsistent with Aguirre's story over the contrary opinions of Aguirre's postconviction experts. And (like the circuit court), the State would have us find dispositive Samantha's alibi for the night of the murders, even though it was provided by her then-boyfriend who has since admitted he was "dead to the world" asleep most of the night. While a second jury may ultimately resolve these (and other) conflicts in the evidence against Aguirre, they do not change the fact that the newly discovered evidence gives rise to a reasonable doubt as to his culpability. Accordingly, Aguirre is entitled to a new trial. See Marek, 14 So. 3d at 990 ("Newly discovered evidence satisfies the second prong of the Jones II test

- 20 -

if it 'weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.' " (quoting <u>Jones</u>, 678 So. 2d at 315)).

## III. CONCLUSION

For the foregoing reasons, we reverse the circuit court's orders denying Aguirre's postconviction motions, vacate Aguirre's convictions and sentences, and remand for a new trial.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

<u>Two Cases</u>:

An Appeal from the Circuit Court in and for Seminole County,
        Jessica J. Recksiedler, Judge – Case No. 592004CF002491A000X
And an Original Proceeding – Habeas Corpus

Maria E. DeLiberato and Julissa Rosalyn Fontán, Assistant Capital Collateral Regional Counsel – Middle Region, Tampa, Florida; Marie-Louise Samuels Parmer of The Samuels Parmer Law Firm, Tampa, Florida; Lindsey C. Boney, IV, Ashley B. Burkett, and Kevin C. Newsom of Bradley Arant Boult Cummings, LLP, Birmingham, Alabama; and Nina Morrison of Innocence Project, New York, New York,

        for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and James Donald Riecks, Assistant Attorney General, Daytona Beach, Florida,

        for Appellee/Respondent

Elliot H. Scherker of Greenberg Traurig, P.A., Miami, Florida; Barry Scott Richard of Greenberg Traurig, P.A., Tallahassee, Florida; and Karen Marcia Gottlieb, Coconut Grove, Florida,

> for Amicus Curiae Former Prosecutors and Government Lawyers Who Sought the Death Penalty at Trial or Defended Capital Convictions on Appeal