**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 23-10811

————————————————

CLEMENTE JAVIER AGUIRRE-JARQUIN,

*Plaintiff-Appellee-Cross Appellant,*

*versus*

SEMINOLE COUNTY, et al.,

*Defendants,*

ROBERT HEMMERT,
   in his individual capacity, Deputy Sheriff,
JACQUELINE GROSSI,
   in her individual capacity, Crime Scene Analyst,
DONNA BIRKS,
   in her individual capacity, Latent Print Examiner,

*Defendants-Appellants-Cross Appellees,*

SEMINOLE COUNTY SHERIFF,

*Defendant-Appellee.*

————————————

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:20-cv-00025-RBD-DCI

————————————

Before JORDAN, LAGOA, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

In 2006, a Florida court sentenced Clemente Javier Aguirre-Jarquin to death for the grievous murders of his neighbors, Cheryl Williams and Carol Bareis. But as Aguirre languished on death row over the course of the next decade, the foundation of his convictions buckled. A 2007 investigation into the Seminole County Sheriff's Office Latent Print Unit revealed a pattern of misconduct that substantially undermined the positive identification of Aguirre as the source of latent prints on the murder weapon. Samantha Williams, the daughter and granddaughter of the victims, also admitted to her involvement in the murders. Post-conviction testing of blood evidence from the murders, most of which had never been tested, corroborated Samantha's admissions and discredited Aguirre's convictions. The Supreme Court of Florida ultimately ordered a new trial. And the State dropped all charges in 2018.

Aguirre, freed from death row, sued Donna Birks, the latent print examiner who investigated the prints on the murder weapon, Robert Hemmert, the lead homicide investigator, and Jacqueline Grossi, the lead crime scene investigator. He also sued the Seminole County Sheriff in his official capacity. Aguirre brought multiple claims under 42 U.S.C. § 1983 relating to the latent print

examination, the investigation, and his prosecution. He also claimed under Florida law that Birks, Hemmert, and Grossi were liable for intentional infliction of emotional distress ("IIED"). The defendants moved for summary judgment, asserting qualified immunity as to the federal claims and state-law immunity as to the state-law claim.

This interlocutory appeal and cross-appeal arises from the District Court's denial of qualified and state-law immunity to Birks, Hemmert, and Grossi. Birks, Hemmert, and Grossi appeal these denials of immunity. Additionally, Aguirre and the appellants ask us to exercise pendent appellate jurisdiction over their appeals of various other determinations of the District Court. After careful review, and with the benefit of oral argument, we exercise our jurisdiction over the denials of immunity and over two evidentiary issues enmeshed with the denial of qualified immunity to Birks. We ultimately affirm in part and reverse in part.

Our opinion proceeds in six parts. In Part I, we recount the two-decade background of this appeal. In Part II, we assess the issues over which we may exercise interlocutory appellate jurisdiction. In Part III, we address two evidentiary issues which Birks appeals. In Part IV, we evaluate the appellants' qualified-immunity appeals. In Part V, we consider Hemmert and Grossi's state-law-immunity appeals. And in Part VI, we conclude.

## I. Background

We begin with the background of this appeal. First, we describe the circumstances of Aguirre's arrest and prosecution.

4                    Opinion of the Court                    23-10811

Then, we review Aguirre's post-conviction proceedings, concluding with the dismissal of all charges. Last, we examine the proceedings before the District Court and the basis of this appeal.

### A. The Murder Investigation and Trial

Around 9:00 AM on June 17, 2004, Mark Van Sandt entered the home of his girlfriend, Samantha Williams, at 121 Vagabond Way in Altamonte Springs, Florida. Samantha lived there with her mother, Cheryl Williams, and her grandmother, Carol Bareis, but spent the night with Van Sandt at his parents' home.[1] When Van Sandt opened the door, he saw Cheryl lying on the ground. He called 911 and described Cheryl as covered in blood and cuts. Her pants were down, and she was cold, stiff, and not breathing.

The Seminole County Sheriff's Office (the "SCSO") dispatched deputies and EMS to the scene. Inside the home, the deputies observed Cheryl's body and noted bloody shoeprints on the floor. A paramedic pronounced Cheryl deceased. About an hour later, Van Sandt realized Bareis's whereabouts had not yet been discovered. Deputies then reentered the home and discovered Bareis in a separate room lying deceased in a pool of blood near her wheelchair. She had been stabbed twice, and she had a blunt force injury to her face.

Robert Hemmert and Jacqueline Grossi arrived on scene at approximately 9:50 AM. The SCSO employed Hemmert as a Major

---

[1] We refer to Cheryl and Samantha Williams by their first names hereinafter to avoid confusion.

Crimes Investigator and Grossi as a Crime Scene Analyst. Hemmert led the homicide investigation while Grossi led the crime scene investigation. At the scene, Hemmert coordinated the information-gathering and canvassing of the neighborhood. After obtaining a search warrant for the home, Grossi began processing the crime scene and collecting evidence.

Hemmert and another officer formally interviewed Van Sandt at approximately 11:30 AM. Van Sandt told them that he and Samantha were at the residence the previous night until about 11:30 PM, when an argument arose. According to Van Sandt, tensions were high between Samantha and Cheryl—the home lacked air conditioning, Samantha was on edge from quitting tobacco, and the two commonly engaged in mother-daughter arguments. But there was no physical fighting. Van Sandt stated that neither he nor Samantha left his home during the night—Samantha did not have a car or even a driver's license. Van Sandt also revealed that Samantha had intermittent explosive personality disorder and had "been Baker Acted a couple times" due to "a nervous breakdown."[2]

Hemmert and the other officer also formally interviewed Samantha at 1:35 PM. Samantha initially told the officers that she and Van Sandt spent the night at a friend's house. When confronted on this deception, Samantha admitted that she lied because Van

---

[2] The Baker Act refers to the Florida Mental Health Act, which allows for an involuntary healthcare evaluation of a person suffering from mental illness. *See* Fla. Stat. § 394.463.

Sandt's parents did not want her in their home.[3]   Samantha acknowledged that she and Cheryl quarreled the night before but claimed they only physically fought when Samantha was younger. Hemmert noticed scarring on Samantha's arm, which Samantha explained as burns from the ovens at her workplace.

During both their interviews, Van Sandt and Samantha reported previous run-ins between Samantha's household and a neighbor living next door at 117 Vagabond Way.  Van Sandt said the neighbor, whom he called "Little Mexico," walked into Samantha's home uninvited in the early morning.  Samantha called the neighbor "Shorty" and reported that on at least three occasions he entered the home uninvited.  One time, she woke around 3 AM to the neighbor standing over her bed.  She told Hemmert and the other officer that the neighbor was intoxicated from drugs when he was discovered in the home.

While canvassing the neighborhood, officers spoke with two residents of 117 Vagabond Way: Guillermo Espinosa and Aguirre. Guillermo and his cousin, Feliciano Sequeida, occupied the house while Aguirre slept in a shed out back.  And Aguirre was identified as the neighbor whom Samantha called "Shorty."  Aguirre provided a written statement, in Spanish, indicating that the night before the discovery of the murders he was at Pretzel's Billiards until 2:00 AM. He then went to the home of a friend, Amparo Salvador Prado

---

[3] Van Sandt's mother confirmed in a formal interview that she did not know Samantha was at the house and that she and Van Sandt's father preferred her to not be there.

Cisneros, with whom he was drinking until 5:45 or 6:00 AM when he returned home to sleep. Although he knew Samantha's name, he denied talking often with the neighbors because he spoke little English. He denied seeing or hearing anything unusual the previous night.

Another officer was searching through the yards which neighbored 121 Vagabond Way. In the yard of 117 Vagabond Way, about three feet from the fence separating the two properties, the officer found "a SYSCO Brand kitchen knife (chef's knife) with a 10 [inch] stainless steel blade and a white plastic handle." The knife had suspected blood on its blade and handle. It was photographed, collected, and placed into evidence for further testing.

Aguirre returned to the area later that day. Thereupon two officers—with a third officer assisting as a translator—conducted a recorded interview with Aguirre. Aguirre stated that at 1:00 PM the prior day he visited Salvador's home to drink beer. Then, after attending a cock fight, they went to Pretzel's. Around 1:00 AM, Aguirre was involved in an altercation at the bar. The bar closed at 2:00 AM, so Aguirre went to Salvador's home—about two or three streets from Aguirre's residence—to continue drinking. Aguirre estimated they arrived at Salvador's house at 2:30 to 2:45 AM. After that, he claimed, he did not remember anything until he arrived home and the sun had risen.

The officers then inquired about Aguirre's relationship with Samantha, Cheryl, and Bareis. He admitted that three or four weeks prior he drunkenly entered their home—one of several

times he went into the house, which he had a habit of doing both when intoxicated and sober. He was told to leave or the police would be called, so he left. According to Aguirre, he was just looking for beer. Nevertheless, Samantha told him that he was no longer welcome in the house.

When the investigators asked to see Aguirre's shoes, the interview changed course. Aguirre requested to speak alone with the Spanish-speaking officer. He admitted to the officer that he was in the country illegally and did not report what he knew to the police because he did not want to return to his home country, Honduras. Aguirre said that he actually entered the crime scene around 6:00 or 6:30 AM and found Cheryl and Bareis dead. The scene was extremely bloody, and his shoes and clothes were full of blood because he lifted up one of the women to check her pulse. He then went home to sleep. After Aguirre gave his written statement in the morning, he went back to Salvador's and talked about the crime scene. Aguirre told Salvador he did not remember anything from that night. But Salvador assured Aguirre that the murders were probably related to a Puerto Rican who had harassed Aguirre, was physically violent toward one of the victims, and possessed a knife or machete.

Hemmert and a Spanish-speaking officer from the Florida Department of Law Enforcement (the "FDLE") took over the interview of Aguirre. Aguirre was read his *Miranda*[4] rights and

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

answered a series of background questions, informing the officers that he was from Tegucigalpa, Honduras; was not involved in any gangs; had been in the United States illegally for about one year; and worked at Luigino's Pasta, a local restaurant. Aguirre repeated that he was drunk the night before and did not remember things very well. In fact, he was drinking all day, having started with Salvador at noon. He arrived at 121 Vagabond Way when the sun had risen, found Cheryl bloody with her shorts pulled down, and felt no pulse when he picked her up. When asked about his bloodied clothing, Aguirre said he went to bed wearing the bloody clothes and shoes, then bagged the clothes and placed them on the shed's roof after he woke up and showered. He was still wearing the shoes. He repeated Salvador's story about a Puerto Rican following Aguirre home, hitting him, being violent toward one of the victims, and having a knife or machete. And he said that in the past he revealed to Samantha his romantic interest in her but had no problem with her lack of reciprocation. Rather, he said they ingested cocaine together until about 6 months prior, when she stopped coming by his bedroom.

When Aguirre was asked to show his body for wounds, the FDLE officer noted scratches all over Aguirre's back and on his arm. But Aguirre blamed the scratches on the trash he took out to the garbage truck. The officers continued to press Aguirre, but he reiterated that he did not know what happened. He gave permission to search through his clothes and bedroom, collect his saliva, fingerprints, and shoes, and photograph his scratches. Aguirre said he did not see or take any murder weapon. Ultimately, Aguirre

denied he did anything and ended the interview by asking to speak to an attorney. At 11:45 PM that night, Aguirre was arrested for tampering with evidence and transported to jail.

Grossi and another analyst photographed Aguirre and collected buccal swabs, fingernail scrapings, and his shoes. The shoes had suspected blood on them. A search warrant for 117 Vagabond Way was then executed. A white plastic bag containing a T-shirt, Nike socks, and Nike shorts were found on the roof of Aguirre's shed, just as he had reported. There were dark red and brown stains on the shorts and socks. Similar stains were observed on the steps leading into the shed and inside the shed's entryway. Inside the bathroom was a pair of underwear—matching the underwear in Aguirre's shed—with suspected blood stains.

Hemmert and the FDLE officer interviewed Salvador, who said Aguirre came back to his house that day—after the discovery of the murders—around 1:00 or 2:00 PM. Aguirre was nervous when Salvador teased him about committing the murders; Aguirre repeatedly asked whether the murderer was really him and whether Salvador really saw him. Aguirre told Salvador that his shoes were bloody and repeatedly asked whether he really committed the murder. Salvador claimed he never told Aguirre about any Puerto Rican. Although Aguirre was very drunk that night, according to Salvador, he had never been violent and never mentioned any problems with his neighbors.

Officers also interviewed Guillermo and John Andrich, the chef of the restaurant where Aguirre and Guillermo worked.

Guillermo said that Cheryl told him she did not want Aguirre at her house because he drank and caused trouble. Guillermo also spoke about a white chef's knife he took from the restaurant kitchen for use at home. Aguirre knew about the knife because it was kept in the house's kitchen for common use. Andrich confirmed that his kitchen had a set of Sysco knives with white handles, a few of which were missing. One missing Sysco knife was a 10-inch chef's knife.

In the following days, Hemmert also interviewed two individuals who were with Aguirre at Pretzel's the night of the murders: David Shupe and Charles Brown. Shupe and Brown met Aguirre's group at Pretzel's and claimed that Aguirre was aggravated and almost hit other patrons with a pool ball during an altercation that night. Shupe, Brown, and Aguirre's group all returned to Salvador's house in the early morning when the bar closed. Aguirre seemingly left Salvador's house when Shupe, Brown, and one of the men left to purchase cocaine. The group failed to buy any drugs, and a fight broke out when they returned to Salvador's, ending with an object thrown through the windshield of Shupe's car. So Shupe and Brown drove away, parked, and returned on-foot for revenge, armed with a samurai-style sword, steak knife, and club. Shupe then stole a car from Salvador's house and crashed it.[5]

---

[5] Although Salvador denied discussing with Aguirre anything about a Puerto Rican, Brown's mother was Puerto Rican and he spoke some Spanish. Shupe's stepfather, who was at Pretzel's with the group, was also Puerto Rican. Salvador was involved in an altercation with Brown and Shupe in the period

Shupe and Brown denied any involvement with the murders. But Brown did tell Hemmert that Samantha "wasn't right in her head" and "was really loopy, always talking about killing herself."

After the SCSO collected latent print exemplars from Guillermo, Feliciano, Shupe, and Brown, Hemmert requested a latent print comparison with the prints on the Sysco knife discovered at 117 Vagabond Way. Certified Latent Print Examiner Donna Birks conducted that investigation after collecting print exemplars from Aguirre in jail. Birks analyzed a photograph of the latent print on the handle of the Sysco knife. From her comparison of the photographed latent print to Aguirre's exemplar, she concluded there was a positive identification with Aguirre's left palm. William McQuay, another print examiner who had retired from the SCSO Latent Print Unit, verified Birks's identification. Birks then communicated her identification to the SCSO on June 24, 2004.

The footwear impressions in suspected blood from the murder scene were also examined. Crime Scene Analyst Christine Craig determined that the footwear impressions were similar in both tread design and size to the shoes collected from Aguirre. There were no other footwear impressions in suspected blood at the scene.

---

between Aguirre's departure in the early morning and return around noon, so Aguirre's comment that Salvador spoke about a Puerto Rican with a knife or machete could have related to this altercation.

Once he received the result of Birks's print analysis, Hemmert, in consultation with the state prosecutor, charged Aguirre with two counts of first-degree premediated murder on June 25, 2004. At Aguirre's arraignment the next day, probable cause was found for the arrest. And on July 13, 2004, a grand jury indicted Aguirre on two counts of first-degree premediated murder for the unlawful killings of Cheryl Williams and Carol Bareis by use of a knife.

⋆          ⋆          ⋆

Aguirre's trial took place from February 20 to 28, 2006. Grossi testified during the State's case in chief, recounting the state of the crime scene and the processing into evidence of various items and blood swabs from both 121 and 117 Vagabond Way. Birks also testified to her examination of the Sysco knife, stating that she concluded it had a print of sufficient quality to make a comparison and that the print positively matched Aguirre's left palmprint.

Aguirre, with the assistance of a translator, testified in his own defense. He testified to entering 121 Vagabond Way in the early morning and touching Cheryl to see if she was alive. But he then added new details. He said he saw the Sysco knife near Cheryl. He also said he went into Bareis's room and checked her body. He picked up the knife and went into Samantha's room, looking for somebody. Discovering no one, he left the house while holding the knife. He eventually discarded the weapon in the yard.

The jury found Aguirre guilty of two counts of first-degree murder and of one count of burglary with an assault or battery. Aguirre was sentenced to death.

### B. Post-Conviction Proceedings

#### 1.

About a year after his conviction and sentencing, Aguirre moved for a new trial. The bases of his motion were the results of an investigation into Donna Birks for her conduct at the SCSO. Tara Williamson, a Latent Print Examiner who trained under Birks, alleged in a memorandum that Birks engaged in improper latent print procedures, identifications, and verifications. This spawned an administrative investigation of the SCSO's Latent Print Unit.

As part of the administrative investigation, the FDLE investigated each case that Williamson raised in her memorandum. Because Williamson alleged that Birks's testimony on the stand during Aguirre's trial "was a complete mockery," Birks's latent print analysis was reviewed. Christina Barber, an analyst in the FDLE's Latent Print Section, reviewed the latent print taken from the Sysco knife found at 117 Vagabond Way. Unlike Birks, who positively identified the print as matching Aguirre's left palm, Barber concluded that the print was of no value for identification purposes. The SCSO also contracted with Ron Smith & Associates, Inc., a private consultant specializing in forensic analysis and training, to determine the accuracy of Birks's identifications in five cases, including Aguirre's. Ron Smith found that the positive identification in Aguirre's case was erroneous.

The Seminole Circuit Court denied Aguirre's motion for a new trial.  It determined that even if the testimony at trial had shown the latent print on the knife to be of no value, the evidence against Aguirre was so damning that the jury would not have acquitted him.  There was no evidence that Aguirre would not have testified but for Birks's testimony that introduced the positive identification, but even so he would have had to respond if there were any hope of acquittal.  And the Court found that the positive identification had no bearing on the penalty phase.

Aguirre appealed the denial of his motion, among other purported issues with his trial and sentencing, to the Supreme Court of Florida.  *See generally Aguirre-Jarquin v. State*, 9 So. 3d 593 (Fla. 2009) (per curiam).  The Supreme Court of Florida affirmed.  *Id*. at 602–03.

2.

In 2012, James Carter, the Assistant State Attorney who prosecuted Aguirre, checked Florida's internal law enforcement records for mental health assessment entries relating to Samantha Williams.  He was aware of a 2001 report of Samantha being detained under the Baker Act before Aguirre's conviction, but did not consider Samantha an alternative suspect in the murders of her mother and grandmother.  The 2001 report, however, showed that Samantha engaged in substance abuse, had explosive bouts of rage in which she harmed herself, was dangerous to others, and had expressed homicidal intentions.  And Carter's 2012 search revealed inculpatory post-conviction police entries related to Baker Act

proceedings against Samantha.  Indeed, on one occasion in August 2010, Samantha attempted to self-immolate at 121 Vagabond Way after telling a neighbor that demons were in her head and that demons caused her to kill her family.  These documents were ultimately disclosed to Aguirre's post-conviction counsel.

Also in 2012, Aguirre's counsel moved for additional post-conviction DNA testing of evidence collected from the crime scene.  Though the tests did not show the presence of Aguirre's DNA, they did show that two blood drops belonged to an unknown female related to the victims.  Further testing revealed it was Samantha's blood near the victims and in the bathroom at 121 Vagabond Way.  Aguirre's DNA was not discovered.

Consequently, Aguirre moved to vacate his convictions and sought collateral relief from his death sentence.  The Supreme Court of Florida vacated his convictions and sentences, remanding the case for a new trial.  *See generally Aguirre-Jarquin v. State*, 202 So. 3d 785 (Fla. 2016) (per curiam).  The Supreme Court of Florida spotlighted Samantha's post-conviction statements, which included five confessions to four people.  *Id.* at 792–94.  This newly discovered evidence, in combination with the newly tested DNA evidence from the crime scene, compelled a new trial.  *Id.* at 794–95.

On November 5, 2018, the State dropped all charges against Aguirre.

*C. District Court Proceedings*

In January 2020, Aguirre sued in the District Court for the Middle District of Florida seeking redress for his 14 years of incarceration—10 of which he served on death row. After multiple rounds of amendments, the operative third amended complaint named as defendants Dennis Lemma in his official capacity as Seminole County Sheriff, Robert Hemmert in his individual capacity, Jacqueline Grossi in her individual capacity, and Donna Birks in her individual capacity.

The complaint contains seven counts:

- Count I alleges under 42 U.S.C. § 1983 that Birks violated Aguirre's Fourteenth Amendment right to a fair trial by intentionally or recklessly fabricating inculpatory evidence—the positive identification of Aguirre as the source of the latent print on the murder weapon.
- Count II alleges under § 1983 that Hemmert violated Aguirre's Fourteenth Amendment right to a fair trial by withholding exculpatory, inculpatory, and impeachment evidence from the SCSO and Aguirre.
- Count III alleges under § 1983 that Hemmert and Birks maliciously prosecuted Aguirre in violation of the Fourth Amendment by arresting and prosecuting Aguirre without probable cause for the two murders.
- Count IV alleges under § 1983 that Hemmert and Grossi violated Aguirre's Fourteenth Amendment rights to due process and a fair criminal proceeding by conducting a defective and biased investigation into the murders.

- Count V alleges under § 1983 that the Seminole County Sheriff is liable under *Monell*[6] for failing to enact policies and failing to adequately train or supervise officers as to the evaluation of witnesses or suspects with histories of mental health crises and related inculpatory conduct.
- Count VI alleges under § 1983 that the Seminole County Sheriff is liable under *Monell* for failing to enact policies and failing to adequately train or supervise officers as to the documentation of exculpatory and impeachment evidence.
- Count VII alleges under Florida law that Hemmert, Grossi, and Birks intentionally inflicted Aguirre with emotional distress.

Birks, Grossi, Hemmert, and Sheriff Lemma moved for summary judgment. Birks argued that she is entitled to qualified immunity as to Counts I and III. Hemmert and Grossi also argued that they are entitled to qualified immunity as to Counts II, III, and IV, and state-law immunity under Fla. Stat. § 768.28(9)(a) as to Count VII.

The District Court denied Birks qualified immunity and summary judgment on Count I. For Count II, it granted summary judgment for Hemmert on the merits. For Count III, the Court denied qualified immunity to both Birks and Hemmert. For Count IV, the Court denied qualified immunity to both Hemmert and Grossi. For Counts V and VI, it granted summary judgment for

---

[6] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978).

Sheriff Lemma. And for Count VII, it denied state-law immunity to and summary judgment for Hemmert and Grossi.

Birks, Hemmert and Grossi, and Aguirre separately pursue interlocutory appeals—and raise a bevy of arguments.

Birks argues the District Court erred by denying her qualified immunity as to Counts I and III. She contends that the District Court erred by considering inadmissible evidence at summary judgment and by improperly considering character evidence for propensity purposes. And she asserts that she is entitled to summary judgment on the merits on Counts I and VII.

Hemmert and Grossi argue the District Court erred by denying Hemmert qualified immunity as to Count III. They also claim that the Court erred by denying Hemmert and Grossi qualified immunity as to Count IV. They contend the District Court erred by denying them state-law immunity as to Count VII[7] and that they are entitled to summary judgment on Count VII anyway.

Aguirre argues that the District Court erred by granting summary judgment for Hemmert on Count II. He also asserts that the District Court erred in granting summary judgment for Sheriff Lemma on Count V. And he contends that the Court erred by excluding one of his expert witnesses.

---

[7] Birks referenced this same contention in her response to the jurisdictional questions we issued but did not assert in her merits briefing or when she moved the District Court for summary judgment that she is entitled to state-law immunity under Fla. Stat. § 768.28(9)(a) as to Count VII.

## II. Appellate Jurisdiction

As an initial matter, we must determine the portions of these appeals, if any, over which we have jurisdiction. *See Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868) ("Without jurisdiction the court cannot proceed at all in any cause."). Generally, we may only hear appeals from a district court's final order. 28 U.S.C. § 1291. "A final order is one that ends the litigation on the merits and leaves nothing for the court to do but execute its judgment." *Freyre v. Chronister*, 910 F.3d 1371, 1377 (11th Cir. 2018) (internal quotation marks omitted). If an order disposes of fewer than all the claims of all the parties or contemplates further substantive proceedings, it is not final. *Supreme Fuels Trading FZE v. Sargeant*, 689 F.3d 1244, 1245–46 (11th Cir. 2012) (per curiam); *Broussard v. Lippman*, 643 F.2d 1131, 1133 (5th Cir. 1981).[8] "We refer to this as the final judgment rule." *Freyre*, 910 F.3d at 1377. Still, we may immediately review orders that "fall into a specific class of interlocutory orders that are made appealable by statute or jurisprudential exception." *CSX Transp., Inc. v. City of Garden City*, 235 F.3d 1325, 1327 (11th Cir. 2000); *see* 28 U.S.C. § 1292.

One exception to the final judgment rule arises in qualified-immunity cases. *Hudson v. Hall*, 231 F.3d 1289, 1293 (11th Cir. 2000). "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final

---

[8] This Court adopted as binding precedent all decisions of the former Fifth Circuit handed down before close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985). But if the only issues appealed relate to the sufficiency of the evidence, then we lack jurisdiction to review the denial of qualified immunity. *English v. City of Gainesville*, 75 F.4th 1151, 1155–56 (11th Cir. 2023). Our jurisdiction is not precluded when the appeal implicates both an issue of fact and an issue of law. *See Koch v. Rugg*, 221 F.3d 1283, 1296 (11th Cir. 2000).

Another exception to the final judgment rule arises in sovereign immunity cases where state law immunizes a state official from suit. *See Butler v. Gualtieri*, 41 F.4th 1329, 1335 (11th Cir. 2022). "We are . . . obliged to consider the denial of sovereign immunity on an interlocutory basis" when the claim of immunity is based on Fla. Stat. § 768.28(9)(a). *Id.* at 1335–36. As in the qualified-immunity context, we lack jurisdiction "where the appeal turns on issues of evidentiary sufficiency." *English*, 75 F.4th at 1157 (citing *Ortiz v. Jordan*, 562 U.S. 180, 188, 131 S. Ct. 884, 891 (2011)).

Finally, "under the doctrine of pendent appellate jurisdiction, we may address nonappealable orders if they are inextricably intertwined with an appealable decision or if review of the former decision is necessary to ensure meaningful review of the latter." *Tillis ex rel. Wuenschel v. Brown*, 12 F.4th 1291, 1297 (11th Cir. 2021) (internal quotation marks omitted); *see also Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 50–51, 115 S. Ct. 1203, 1212 (1995). "Matters may be sufficiently intertwined where they implicate the same facts and the same law." *Smith v. LePage*, 834 F.3d 1285, 1292 (11th Cir.

2016) (internal quotation marks omitted) (alteration adopted). But "the Supreme Court has signaled that pendent appellate jurisdiction should be present only under rare circumstances." *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1379 (11th Cir. 2009) (per curiam) (first citing *Johnson v. Jones*, 515 U.S. 304, 318, 115 S. Ct. 2151, 2159 (1995); and then citing *Swint v. Chambers Cnty. Comm'n*, 514 U.S. at 49–50, 115 S. Ct. at 1211).

In determining our appellate jurisdiction, we engage in *de novo* review. *See Butler v. Gualtieri*, 41 F.4th at 1334 (citing *Thomas v. Phoebe Putney Health Sys., Inc*, 972 F.3d 1195, 1200 (11th Cir. 2020)).

### A. Qualified Immunity

The interlocutory appeals of the District Court's denial of qualified immunity to Birks, Hemmert, and Grossi squarely fit into our qualified-immunity exception to the final judgment rule.

Birks asks us to exercise jurisdiction over her appeal of the Court's denial to her of qualified immunity as to Count I. She argues, in part, that it was not clearly established that her conduct was unlawful. To be sure, the District Court focused its assessment of Birks's qualified-immunity claim on factual issues—whether she fabricated the positive palmprint identification and her intent or lack thereof in so doing. But Birks disputes on appeal the District Court's determination that preexisting law clearly established that her conduct as a latent print examiner was unlawful. This is not a case where Birks only raises issues as to the District Court's determination of what happened in Birks's print lab in the lead-up to Aguirre's arrest. *Cf. English*, 75 F.4th at 1156. Rather, Birks's appeal

raises an issue of law, supplying us with jurisdiction over her appeal of the District Court's denial of qualified immunity to her as to Count I, notwithstanding any alleged issues of fact. *See Hall v. Flournoy*, 975 F.3d 1269, 1276 (11th Cir. 2020) ("[J]urisdictional issues arise when the <u>only</u> question before an appellate court is one of pure fact." (emphasis in original)).

Hemmert and Birks also ask us to exercise appellate jurisdiction over their appeal of the District Court's denial of qualified immunity to them as to Count III. They argue, in part, that the existence of arguable probable cause to seize Aguirre entitles them to qualified immunity. The District Court assessed their arguable-probable-cause arguments by considering the totality of the circumstances. It tallied the facts known to the arresting officers about Aguirre and Samantha to conclude no warrant would have issued if the positive print identification were removed and omitted facts were included. Hemmert and Birks attack this conclusion, contesting the District Court's framing of the probable cause analysis—and thus its determination of whether they violated Aguirre's constitutional rights at all—as misapplying legal standards. The argument they raise on appeal concerns the existence of arguable probable cause at the time of Aguirre's arrest, "a pure question of law," *Swint v. City of Wadley*, 51 F.3d 988, 996 (11th Cir. 1995), rather than an underlying factual dispute as to the events giving rise to Aguirre's arrest, *cf. English*, 75 F.4th at 1156. We therefore have jurisdiction over the appeal of the Court's denial of qualified immunity to Birks and Hemmert as to Count III.

Finally, Hemmert and Grossi ask us to exercise jurisdiction over their appeal of the Court's denial to them of qualified immunity as to Count IV. They argue that no clearly established law proscribed their failure to investigate beyond the evidence pointing to Aguirre. They contest the legal basis of the District Court's conclusion that it was clearly established that they were required to pursue additional evidence and testing to ensure a constitutionally adequate investigation. Again, this is a question of law concerning "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." *Jackson v. City of Atlanta*, 97 F.4th 1343, 1351 (11th Cir. 2024) (internal quotation marks omitted). Accordingly, we have jurisdiction over the appeal of the Court's denial of qualified immunity to Hemmert and Grossi as to Count IV.

### B. State-Law Immunity

We also conclude that Hemmert and Grossi's interlocutory appeal of the District Court's denial to them of immunity under Fla. Stat. § 768.28(9)(a) falls within an exception to the final judgment rule.

Hemmert and Grossi contend that the District Court erred by denying them immunity under § 768.28(9)(a) as to Count VII. That statute immunizes officers from liability in tort "unless such officer . . . acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a). In a footnote, the District Court denied Hemmert and Grossi immunity because there are

23-10811               Opinion of the Court                    25

factual disputes as to whether they acted in "bad faith." On appeal, they contest the District Court's application of the "bad faith" standard in § 768.28(9)(a), claiming that the Court offered no substantiation for its conclusion and that all factual disputes should be resolved at summary judgment regardless.

Hemmert and Grossi raise a question of law sufficient to sustain our jurisdiction over this appeal. They challenge the District Court's understanding of the legal standard of "bad faith" in Fla. Stat. § 768.28(9)(a). Whether the District Court applied the proper legal standard is unclear because the Court offered no rationale for its denial of immunity other than the summary statement that "there are factual disputes over whether they acted in bad faith." Hemmert and Grossi do not contend that they did not perform certain conduct or that there is insufficient evidence of them engaging in certain conduct—purely factual questions—but that the District Court's understanding of the standard applied to that conduct was wrong. This is a legal question, even if the absence of rationale for the Court's denial of immunity requires us "to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the non-moving party, likely assumed." *Behrens v. Pelletier*, 516 U.S. 299, 313, 116 S. Ct. 834, 842 (1996) (internal quotation marks omitted). We therefore have jurisdiction over this portion of the interlocutory appeal. *See English*, 75 F.4th at 1157.

*C. Pendent Appellate Jurisdiction*

We now turn to our jurisdiction over the remaining issues on appeal. Because these are neither denials of qualified immunity nor of state-law immunity, we evaluate whether we can exercise pendent appellate jurisdiction over these issues.

1.

Birks asks us to exercise jurisdiction over her appeal of the District Court's consideration of certain evidence at summary judgment. She contends that the District Court erred when considering various statements from the SCSO's 2007 investigative report (the "2007 Report") concerning Birks's conduct in operating the SCSO Latent Print Unit, most of which are summaries of statements made to investigators. And she contends that the District Court improperly used the contents of the 2007 Report as evidence of her character to infer that Birks fabricated her positive identification of Aguirre in accordance with that character.

The exercise of pendent jurisdiction "is only proper in *rare and unique circumstances* where a final appealable order is inextricably intertwined with an unappealable order or where review of the unappealable order is necessary to ensure meaningful review of the appealable order." *Wallace v. Cnty. of Comal*, 400 F.3d 284, 292 (5th Cir. 2005) (citing *Thornton v. Gen. Motors Corp.,* 136 F.3d 450, 453 (5th Cir.1998)) (emphasis added). Exercising pendent jurisdiction is discretionary but can be appropriate when refusing to exercise jurisdiction would "defeat the principal purpose of allowing an appeal of immunity issues before a government employee is forced to go to trial." *Morin v. Caire*, 77 F.3d 116, 119 (5th Cir. 1996).

Here, despite the District Court citing the 2007 Report in its reasoning for denying qualified immunity to Birks as to Count I for allegedly fabricating the palmprint immunity, the report is but one of many factors considered.  The Court cites the 2007 Report only once by itself in the section weighing whether to grant qualified immunity to Birks—to show that Birks erroneously identified a positive match in Aguirre's case.  Otherwise, the Court either references uncontested evidence, or cites the 2007 Report in conjunction with uncontested evidence.  The District Court cites sufficient additional evidence to determine that Birks is not entitled to qualified immunity, such as her sending print match verifications to McQuay, multiple instances of failing to verify prints at all, and at least one instance of discussing a potential suspect before making her identification.  The contested statement is not outcome determinative and therefore is not "inextricably intertwined" with the qualified immunity determination.  Thus, we decline to extend pendent jurisdiction to Birk's appeal of the District Court's decision to consider the 2007 Report.

Birks also asks us to exercise jurisdiction over the appeal of the District Court's denial of summary judgment to her on Counts I and VII on the merits.  For Count I, Birks argues that the District Court erred because it denied her argument that any factual issue concerning her conduct was not material to Aguirre's arrest and conviction.  She also argues that there is no issue of fact as to whether her conduct as a print examiner amounted to fabrication of evidence.  For Count VII, Birks incorporates her previous

argument that insufficient evidence of fabrication results in an absence of any issue of fact, entitling her to summary judgment.

We decline to exercise jurisdiction over these claims. Certainly, we will consider the factual assertions underlying the two claims when addressing her appeal of the District Court's denial of qualified immunity to her as to Counts I and III. Count VII, after all, expressly incorporates the factual assertions underlying the § 1983 claims against Birks in Counts I and III. But this is not enough to implicate our discretionary pendent appellate jurisdiction. Rather, the claims may be sufficiently intertwined for purposes of pendent appellate jurisdiction when they "implicate[] the same facts *and the same law*." *LePage*, 834 F.3d at 1292 (alteration in original) (emphasis added) (internal quotation marks omitted).

Whether Birks's conduct violated clearly established law does not necessarily entail a resolution of whether her conduct constituted IIED under Florida law, or whether her conduct was material to Aguirre's arrest and conviction. We can resolve the qualified-immunity issue, for example, without having to consider whether her conduct was "'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Lopez v. Target Corp.*, 676 F.3d 1230, 1236 (11th Cir. 2012) (quoting *Restatement (Second) of Torts* § 46 cmt. d (Am. L. Inst. 1965)). The same holds true for whether the factual allegations about Birks's conduct are material such that they "might affect the outcome of the suit under the governing law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106

S. Ct. 2505, 2510 (1986).  These are legal questions that we will not necessarily answer as part of the qualified-immunity analysis.  Because "resolution of the nonappealable issue[s] [is] not necessary to resolve the appealable one," *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 814, 820 (11th Cir. 2010) (internal quotation marks omitted), we decline to exercise pendent appellate jurisdiction over Birks's appeals of these denials of summary judgment to her on Counts I and VII.

2.

Hemmert and Grossi ask us to exercise jurisdiction over their appeal of the District Court's denial to them of summary judgment on Count VII on the merits.  They argue that their conduct does not constitute IIED because their conduct was not outrageous.  For the reasons we explained when considering Birks's appeal of the denial of summary judgment to her on Count VII, we decline to exercise pendent appellate jurisdiction over Hemmert and Grossi's appeal.  Although the factual allegations concerning their conduct are properly within our ambit for purposes of assessing their immunity claims, that assessment does not require us to resolve the wholly separate legal question of whether

their conduct fails to satisfy the elements of a Florida-law IIED claim.

3.

Finally, Aguirre asks us to exercise jurisdiction over three issues in his cross-appeal. We find no basis to exercise our pendent appellate jurisdiction.

He first seeks to appeal the District Court's grant of summary judgment on the merits for Hemmert on Count II. He argues that the Court erred by failing to analyze his *Brady*[9] claim in its entirety, instead mischaracterizing the *Brady* evidence at issue and erroneously assessing Hemmert's failure to disclose evidence as part of Aguirre's separate spoliation claim. He also argues that there is a genuine issue of material fact as to whether Hemmert suppressed evidence, precluding summary judgment. There is some factual overlap between Count II and Counts III and IV, but Count II also involves distinct factual allegations about Hemmert's disclosure of information to Aguirre's prosecutors and defense counsel. And the District Court's legal conclusions regarding the *Brady* claim are extrinsic to the immunity frameworks through which we will address Hemmert's conduct. These *Brady* matters are therefore not inextricably intertwined with the appealable immunity decisions, nor is review necessary to ensure meaningful review of the denials of immunity. *See LePage*, 834 F.3d at 1292.

---

[9] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

Aguirre also seeks to appeal the grant of summary judgment for Sherriff Lemma on Count V. Count V is a *Monell* claim centered on the SCSO's alleged policy, custom, or practice of deliberate indifference and inadequate training of its officers regarding witnesses or suspects with histories of mental health crises and related inculpatory conduct. While this claim stems from Hemmert and Grossi's investigation, it does not "seem to us that the issue is inextricably intertwined" with their immunity claims because this liability claim "raises [a] wholly separate issue" of departmental conduct which "is not an issue that must be determined—or even considered—in resolving the immunity claims." *Jones v. Fransen*, 857 F.3d 843, 850 (11th Cir. 2017).

Finally, Aguirre seeks to appeal the District Court's exclusion of one of his expert witnesses. That expert witness's proposed testimony related to the conditions of Aguirre's imprisonment, not the conduct of any of the defendants during their investigation and prosecution of Aguirre. The exclusion does not implicate the same law or the same facts as any of the claims over which we are exercising appellate jurisdiction, so we cannot say they are inextricably intertwined. *See LePage*, 834 F.3d at 1292. And it is unnecessary to resolve the issue to ensure meaningful review of the immunity claims in this appeal. *Hudson*, 231 F.3d at 1294.

⋆          ⋆          ⋆

In summary, we have appellate jurisdiction over the appeals of the denials of immunity to Birks as to Counts I and III, to

Hemmert as to Counts III, IV, and VII, and to Grossi as to Counts IV and VII. We now turn to the merits.

## IV. Qualified Immunity

Lawsuits levied against public officials in their personal capacity impose costs both on the defendant officials and on society as a whole, including litigation expenses, diversion of official energy from pressing public issues, deterrence of able citizens from accepting public office, and dampening of officials' ardor in performing their duties. *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S. Ct. 2727, 2736 (1982). The defense of qualified immunity "is the public servant's (and society's) strong shield against these dangerous costs." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996). It protects government officials performing discretionary functions from civil litigation and liability if their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known. *Id.* (citing *Harlow*, 457 U.S. at 817–19, 192 S. Ct. at 2738). It accomplishes this protection by granting officials "immunity from suit," meaning "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell*, 472 U.S. at 526, 105 S. Ct. at 2815.

Each official who asserts qualified immunity is entitled to "an independent qualified-immunity analysis as it relates to his or her actions and omissions." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). The official "must first prove that he was acting within his discretionary authority" when he performed the acts of which the plaintiff complains. *Bowen v. Warden*, 826 F.3d 1312, 1319 (11th

Cir. 2016) (internal quotation marks omitted). Once this is established, "the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (citing *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003)). The plaintiff must establish that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.* Judges may decide which of the two prongs of this analysis to address first in light of the circumstances in the case at hand. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009).

To be clearly established, the contours of a right must be sufficiently clear such that every reasonable officer would have understood his conduct to violate that right. *Fuqua v. Turner*, 996 F.3d 1140, 1150 (11th Cir. 2021) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083 (2011)). A plaintiff may show this through: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citations omitted). The law must not be defined at a high level of generality, but rather be particularized to the facts of the case. *Fuqua*, 996 F.3d at 1150.

When an officer moves for summary judgment on the basis of qualified immunity, "[t]he court shall grant summary judgment

if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Even though, at this posture, the facts are construed in the light most favorable to the plaintiff, *Jones v. Cannon*, 174 F.3d 1271, 1281 (11th Cir. 1999), the evidence may create a fact question about whether the officer engaged in violative conduct, *id.* at 1290. "[A] genuine fact issue as to what conduct the defendant engaged in would preclude a grant of summary judgment based upon qualified immunity." *Rich v. Dollar*, 841 F.2d 1558, 1565 (11th Cir. 1988).

The District Court denied qualified immunity to Birks as to Counts I and III, to Hemmert as to Counts III and IV, and to Grossi as to Count IV. Each appeals each denial, and Aguirre does not contest that each was acting in a discretionary function. We therefore divide our discussion by Count, addressing the appellants' contentions separately. And in considering whether each officer is entitled to summary judgment based on qualified immunity, we review *de novo*. *See English*, 75 F.4th at 1155 (citing *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1157 (11th Cir. 2010)).

## A. Count I

Count I of Aguirre's complaint alleges that Birks deprived Aguirre of his right to a fair trial by intentionally or recklessly fabricating inculpatory evidence of Aguirre's palmprint matching the latent print on the murder weapon. The District Court determined that it was clearly established that fabricating incriminating evidence violates the right to due process. It then concluded that a

genuine factual dispute exists as to Birks's conduct in the Aguirre investigation, precluding qualified immunity.  On appeal, Birks argues that the District Court erred because no law clearly established that her conduct in providing a faulty forensic expert conclusion was unlawful.  We disagree with Birks.

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" such that "in the light of pre-existing law the unlawfulness [is] apparent."  *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002) (internal quotation marks and citations omitted).  Sometimes, "a very high degree of prior factual particularity may be necessary" to provide fair warning.  *United States v. Lanier*, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227 (1997) (citation omitted).  "But general statements of the law are not inherently incapable of giving fair and clear warning," with general constitutional rules expressed in decisional law able to apply with "obvious clarity" to the conduct in question.  *Id.*  Aguirre claims that Birks fabricated her identification of the latent print on the knife used in the murders as belonging to Aguirre, so we must look to whether "every reasonable government official" would have "fair and clear notice" that such conduct violated Aguirre's rights.  *See Marsh v. Butler Cnty.*, 268 F.3d 1014, 1031 (11th Cir. 2001) (en banc), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561–63, 127 S. Ct. 1955, 1968–69 (2007).

Our decisional law provided such notice.  In *Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977), our predecessor Circuit

36                    Opinion of the Court                    23-10811

determined that constitutional due process is implicated when a state law enforcement officer offers false inculpatory evidence that the State uses to incriminate a suspect.[10]  552 F.2d at 595.  We have reiterated *Schneider*'s holding multiple times in varying circumstances.  *See Riley v. City of Montgomery*, 104 F.3d 1247, 1253 (11th Cir. 1997) (planting cocaine in a suspect's car); *Jones*, 174 F.3d at 1289–90 (fabricating a boot print at a murder scene); *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1281 (11th Cir. 2002) (switching exculpatory evidence with inculpatory evidence during a search).  Our statements in all these cases are manifestations of the bedrock principle that "a conviction obtained through use of false evidence, known to be such by representatives of the State," is tainted so as to violate the mandate of the Fourteenth Amendment.  *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959) (citations omitted).

Together, these cases at least set forth a principle that it is unlawful for a law enforcement officer to falsely create or falsely attest to the existence of incriminating evidence.  Even assuming our case law is not "directly on point," the "principles" evinced by and the "reasoning" in these cases would have fairly apprised reasonable officers in Birks's position that falsely presenting evidence confirming a suspect as the source of a latent print on a murder weapon—and then falsely testifying to the inculpatory nature of

---

[10] In *Schneider*, the fabricated evidence consisted of an officer's testimony that a suspect committed armed robbery against him, when it was later alleged that the officer was only the victim of theft.  552 F.2d at 594–95.

23-10811                Opinion of the Court                      37

that evidence at trial—is unlawful. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (internal quotation marks omitted).

Birks resists this conclusion. She argues that our case law is far too removed from her circumstances to provide her fair notice. That is because, according to Birks, the allegedly unlawful conduct was merely "being overly confident or wrong in expressing [her] opinion" that Aguirre was the source of the latent prints on the murder weapon, not fabricating inculpatory evidence out of whole cloth. But that mischaracterizes Aguirre's allegations and the forensic process required to confirm inculpatory evidence that a suspect is the source of latent prints. Positively identifying a suspect as the source of latent prints involves two steps: (1) comparison by a print examiner of a latent print of sufficient investigatory value to known prints to conclude a positive match; and (2) verification by an independent, competent examiner of the results of the comparison. Only after the second step can a positive identification be confirmed.

Aguirre's complaint specifically targets Birks's verification, alleging that Birks failed to have her latent print examinations properly verified and that the positive identification was fabricated. Aguirre's brief in opposition to summary judgment stresses this requirement of verification as antecedent to an inculpatory positive identification. And it highlights Birks's potential use of William McQuay to verify results despite (or because of) McQuay's known infirmities that vitiated his competence as a verifier. The

purposeful failure to properly verify the results of a positive comparison is not mere error or overconfidence in expressing a forensic conclusion; it is the absence of a step required to report incriminating forensic evidence. Any intentional transmittal to investigators of a positive identification without this step would thus be a fabrication of a forensic result, akin to reporting that a drug test confirms the identity of a substance even though the testing did not result in a confirmation. *Cf. Manuel v. City of Joliet*, 580 U.S. 357, 368, 137 S. Ct. 911, 919 (2017).[11] This is not so far removed from the clearly established principle that it is unlawful to knowingly incriminate a suspect by falsely creating or falsely attesting to the existence of inculpatory evidence so as to entitle Birks to qualified immunity. Our cases provided fair notice of such unlawfulness.

⋆          ⋆          ⋆

Having determined that the law was clearly established, we now address whether Birks engaged in conduct that violated the law. Because the evidence at summary judgment creates a genuine factual question about Birks's verification of her positive identification of Aguirre as the source of latent prints on the murder weapon, Birks is not entitled at this stage to qualified immunity.

---

[11] In *Manuel*, the Supreme Court acknowledged in passing that the creation and transmittal of a positive drug test was a "police fabrication[]" of incriminating evidence when the substance did not actually test positive. 580 U.S. at 368, 137 S. Ct. at 919. *Manuel* post-dates Birks's conduct during Aguirre's investigation, so we do not rely on it as clearly establishing any law for purposes of this appeal. We cite *Manuel* only to corroborate our reasoning.

The evidence creates a factual dispute about whether Birks selected McQuay as a verifier to avoid a proper verification by a competent print examiner, thereby fabricating the ultimate forensic result. At the time of the Aguirre investigation, only Birks and one trainee worked in Birks's forensic unit. But Birks reportedly requested verification of her identification from McQuay. McQuay had officially retired at this time and was in questionable health.

Birks alleges she did not know his health status at the time, but by the 2007 Report she claimed that McQuay told her that he was sick and that she knew his health led to his retirement. According to Tara Williamson—the trainee—McQuay was noticeably sick and was taking medication when she joined the Latent Print Unit. He would fall asleep mid-conversation and err when performing verifications, which Birks knew.

According to Williamson, Birks also called McQuay "incompetent" on previous occasions. Indeed, Williamson claimed that Birks bullied McQuay with an intent to force him out of the unit due to his incompetence. Yet when Birks disagreed with other analysts' verification conclusions, she would have McQuay verify them instead. One examiner in the Latent Print Unit was shocked when Birks sent an identification to McQuay for verification after two separate examiners would not verify it. Other times, Birks declined to obtain any verification of her results at all, relied on unqualified examiners to approve her results, or pressured examiners to verify her results. In her own words, she "had exceptions" to the normal verification process. Nevertheless, Birks claimed in the

2007 Report that she did not consider it proper to have a verification performed by an analyst in poor health or who was not able to properly verify identifications.

None of this evidence directly relates misconduct during Aguirre's investigation specifically. But when we draw inferences from this evidence in the light most favorable to Aguirre, reasonable jurors could conclude that Birks, by intentionally selecting a person whom she considered incompetent or incapable as a verifier, fabricated an ultimate forensic result incongruent with what she could actually determine from her examination of the murder weapon. Reasonable jurors could conclude that she intentionally selected McQuay as a verifier to avoid a competent examination that would impede her inculpation of Aguirre.

So the evidence creates a genuine factual dispute about Birks's conduct as to the verification of Aguirre's positive identification. A jury must resolve this question of fact, precluding qualified immunity. *See Jones*, 174 F.3d at 1290.

*B. Count III*

In Count III, Aguirre claims that Hemmert and Birks maliciously prosecuted him in violation of the Fourth Amendment. The District Court denied Hemmert and Birks qualified immunity, concluding that it was clearly established that reckless material misstatements or omissions in an arrest affidavit negate probable cause in violation of the Fourth Amendment. It then determined that there is a factual dispute about the materiality and recklessness of omissions in the affidavit, whether Birks fabricated the latent print

23-10811                Opinion of the Court                41

identification, and whether Hemmert intentionally or recklessly included selective information in the arrest affidavit to implicate Aguirre. Finally, it held that there was not arguable probable cause to arrest Aguirre.

On appeal, Hemmert disputes the Court's acceptance of a Fourth Amendment basis for a malicious-prosecution claim and asserts that Aguirre's grand jury indictment is an intervening act that terminates his liability.[12] He also argues that it was not unlawful to detain and charge Aguirre because there was arguable probable

---

[12] We can quickly dispose of these arguments. Although Hemmert disputes the legal basis in the Fourth Amendment for a malicious-prosecution claim, we are not at liberty to deny the contrary conclusion of a majority of the Supreme Court in *Thompson v. Clark*, 596 U.S. 36, 142 S. Ct. 1332 (2022). *See Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 889 (11th Cir. 2024) ("The Supreme Court has explained that inferior courts must follow its precedent that has direct application in a case." (internal quotation marks omitted)). "[W]e must leave to the Supreme Court the prerogative of overruling its own decisions." *Id.* (internal quotation marks omitted).

As to Hemmert's second argument, the Supreme Court has also explained that an intervening indictment does not necessarily "expunge such a Fourth Amendment claim." *Manuel*, 580 U.S. at 369, 137 S. Ct. at 920 n.8. Hemmert's reliance on *Jones v. Cannon* to the contrary is misplaced. There, we cabined our statements to claims concerning "detention from [an] alleged *false arrest*," *Jones*, 174 F.3d at 1287 (emphasis added), not to claims of malicious prosecution. And as we have said elsewhere, "[a] subsequent indictment does not retroactively provide probable cause for an arrest that has already taken place." *Garmon v. Lumpkin Cnty.*, 878 F.2d 1406, 1409 (11th Cir. 1989). Finally, as Hemmert acknowledges in his brief on appeal, any consideration of an indictment would go to the extent of Aguirre's damages, not to the validity of his malicious-prosecution claim.

cause that Aguirre murdered Cheryl and Bareis.  Birks adopts this argument, asserting that there was arguable probable cause for Aguirre's detention even when her latent print identification is excised from the probable-cause affidavit.

"Our precedent has long separated malicious-prosecution claims from false-arrest or imprisonment claims . . . ."  *Gervin v. Florence*, 139 F.4th 1236, 1253 (11th Cir. 2025) (citations omitted). While both claims involve seizures, a malicious-prosecution claim focuses on "seizure[s] pursuant to legal process."  *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020) (internal quotation marks omitted).  The gravamen of a malicious-prosecution claim is that a Fourth Amendment violation occurs "when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements."  *Manuel*, 580 U.S. at 367, 137 S. Ct. at 918.  Malicious prosecution therefore extends to seizures based on warrants or seizures following an arraignment, indictment, or probable-cause hearing. *See Williams*, 965 F.3d at 1158.  To succeed on a malicious-prosecution claim, then, a plaintiff must show that the legal process justifying the seizure was defective due to constitutional infirmities.  *See Butler v. Smith*, 85 F.4th 1102, 1112 (11th Cir. 2023) (en banc). When, as here, there was a warrantless arrest followed by a finding of probable cause, we focus on the probable-cause affidavit.[13]  *See Kelly*

---

[13] The record is somewhat confused as to the precise document and proceeding that established probable cause for Aguirre's seizure.  Aguirre's first appearance was on June 26, 2004, during which probable cause was found for

23-10811                Opinion of the Court                43

*v. Curtis*, 21 F.3d 1544, 1553–55 (11th Cir. 1994) (determining qualified immunity where the plaintiff claimed malicious prosecution based, in part, on the defendant officer's statements to the District Court at a probable-cause hearing); *Williams*, 965 F.3d at 1163 ("[S]eizures pursuant to legal process concern whether the judicial officer who approved the seizure had sufficient information to find probable cause.").

The affidavit may be constitutionally defective when an officer has intentionally or recklessly made misstatements or omissions necessary to support the probable-cause finding. *See Butler v. Smith*, 85 F.4th at 1112. The unlawfulness of such conduct was clearly established at the time of Aguirre's investigation. *See Kelly*, 21 F.3d at 1554. Our analysis of an affidavit's integrity proceeds in two steps. We first evaluate an allegedly defective affidavit by assessing whether there were any intentional or reckless misstatements or omissions. *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir.

---

charges of homicide. A grand jury returned an indictment on July 13, 2004, but no recordings, transcription, or minutes of that proceeding are included in the record. Although Hemmert acknowledged in his civil deposition that he provided the grand jury with a supporting affidavit and testimony, he also referred to a shorter and less-detailed arrest report as "basically" his probable-cause affidavit. That arrest report, written immediately after Aguirre's warrantless arrest, is included in the record, and the District Court appears to have treated the report as Hemmert's probable-cause affidavit. The parties in their briefs also treat the arrest report as the pertinent affidavit for their probable-cause arguments, despite sometimes referring to it as a warrant application.

We follow the District Court and treat the arrest report as the probable-cause affidavit supporting Aguirre's seizure for the homicide offenses.

2019).  We then ask whether probable cause would be negated if such statements were removed or omissions included.  *Id.*  More precisely, in the qualified-immunity context we review for "arguable" probable cause.  *See Butler v. Smith*, 85 F.4th at 1116.  This "arguable-probable-cause standard asks whether a 'reasonable officer[] in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed.'" *Id.* (alterations in original) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004)).  And in applying this standard, we consider only the information before the magistrate, minus any material misstatements, plus any material, omitted information. *See id.*

We begin by listing the misstatements and omissions that form the basis of our arguable-probable-cause analysis.  Then we assess whether the affidavit, cured of the alleged misstatements and omissions, provided arguable probable cause for Aguirre's seizure for the murders of Cheryl and Bareis.  We conclude that it does still provide arguable probable cause, thereby entitling Birks and Hemmert to qualified immunity as to Count III.

1.

First, we review the alleged omissions.  The District Court pointed to twelve items that, if included, would have vitiated arguable probable cause to arrest Aguirre:

- [Samantha] lied at first about her alibi
- [Samantha] had been drinking the night of the murders

- [Samantha] had anger and mental health issues
- [Samantha] was diagnosed with intermittent explosive disorder
- [Samantha] had been Baker Acted before
- [Samantha] fought with her mother the night of the murders
- [Samantha] had a historically bad relationship with her mother
- [Samantha] had gotten into physical fights with her mother
- [Samantha's] mother had been stabbed over 125 times
- [Samantha's] boyfriend had serious ongoing trouble with the law
- [Samantha] and her boyfriend had various inconsistencies in their stories
- [Samantha] and her boyfriend both had wounds on their bodies

We assume, for purposes of this appeal, that each omission was intentionally or recklessly made.

As to the misstatements, the analysis becomes more complicated. The District Court assumed that the statement in Hemmert's affidavit reporting Birks's positive latent print identification was a misstatement because the identification was allegedly fabricated. Because Birks—as the transmitter of the positive identification—had reason to doubt the veracity of this statement, we, too, will assume this was an intentional or reckless misstatement

despite Hemmert as the affiant having no reason to doubt its veracity. *See United States v. Kirk*, 781 F.2d 1498, 1503 & n.5 (11th Cir. 1986); *see also Franks v. Delaware*, 438 U.S. 154, 163, 98 S. Ct. 2674, 2680 & n.6 (1978) (contrasting a reporting officer's misstatements with a private informer's misstatements because "police [may] not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity").

To this, Aguirre adds on appeal three additional "false allegations" in Hemmert's affidavit:

- First, he claims that the murder weapon was different from the Sysco knife that was allegedly missing from Aguirre's workplace.
- Second, he claims that the murder weapon was characteristically different from the knives that Aguirre's cotenants told the police were available in their shared kitchen.
- Third, he claims that Aguirre's shoes did not match the footwear impressions found at the crime scene because one of his shoes had a twig lodged in its tread, which was not reflected in the impressions found at the victims' residence.

Although Aguirre is unclear in appellate briefing as to whether these are to be considered as misstatements or omissions, he clearly characterized them before the District Court as misstatements that must be excised from Hemmert's affidavit. Therefore, we must first determine whether we credit these as misstatements in our arguable-probable-cause analysis. *See Butler v. Smith*, 85 F.4th at 1114

(rejecting excision of an alleged misstatement because the affiant reasonably believed in the veracity of the statement).

We do not credit Aguirre's first two assertions about the Sysco knife found in Aguirre's yard. For a statement in an affidavit to be considered a misstatement violative of the Fourth Amendment, the affiant must not have had "'a reasonable belief in [the] veracity' of the information that she provides, regardless of whether it ultimately turns out to be true." *Butler v. Smith*, 85 F.4th at 1114 (alteration in original) (quoting *Paez*, 915 F.3d at 1286–87)). Where undisputed facts support that the affiant "had 'reason [to] belie[ve] in [the] veracity' of her statement," then we will not excise the alleged misstatement. *See id.* (alterations in original) (quoting *Paez*, 915 F.3d at 1286). This analysis extends to "any officer who provided information material to the probable cause determination," not only to the affiant. *Williams*, 965 F.3d at 1169 (citations and internal quotation marks omitted). Still, when considering information proffered by another officer to the affiant, the transmitting officer must have had some "reason to suspect that the information upon which they were relying was incorrect." *See Kirk*, 781 F.2d at 1503 & n.5.

Aguirre does not sufficiently show that Hemmert or the transmitting officers did not reasonably believe in the veracity of the information in the affidavit linking the murder weapon to the Sysco knife missing from Aguirre's workplace. The only piece of evidence Aguirre points to is a police interview with John Andrich, the head chef at Aguirre's workplace, in which Andrich describes

48                    Opinion of the Court                    23-10811

the Sysco knives in the restaurant's possession.[14]  The transcription of that interview produced in 2022 reports Andrich's description of the Sysco knives as:

> They're different shaped, all white-handled, and there's a serrated, a chef's knife, a cook's knife, and a boning knife, and a steel that's in there . . . .

But the 2004 transcription of that interview differs slightly:

> They're different shaped, all white handled and there's a serrated chef's knife, a cook's knife and a bonding knife and that's steel that's in there.

The parties dispute whether Andrich in the interview referred to both a chef's knife *and* a serrated knife, or whether "serrated" adjectivally modified "chef's knife."  Because the Sysco knife found in Aguirre's yard was not serrated, Aguirre claims Hemmert's statements in the affidavit about the restaurant's knife were seriously misrepresentative.

However, Aguirre does not forward evidence that Hemmert or the other officers were aware of this distinction or did not reasonably believe that the murder weapon was similar to the restaurant's missing chef's knife.  Rather, Hemmert in his 2021 civil deposition stated that, based on statements given by Aguirre's cotenants and coworkers to investigating officers, he believed the knife

---

[14] Neither the record nor the parties specify whether this information in the affidavit was construed by Hemmert from the transcript or recording of Andrich's interview, or reported to Hemmert by Andrich's two interviewers, Investigator Jeffrey Bean and Sergeant John Negri.

23-10811              Opinion of the Court              49

that was found in Aguirre's yard was similar to the knife missing from Andrich's restaurant. And Investigator Bean in his 2004 criminal deposition stated that he learned from his interview of Andrich that the knife recovered from Aguirre's yard was similar to the set of knives used at the restaurant. Aguirre does not argue, nor is there any evidence in the voluminous record indicating, that Hemmert erred despite relying on the 2004 transcript of Andrich's interview in drafting his affidavit—especially as the transcription was only completed on June 25, 2004, the same day Hemmert arrested Aguirre and completed the probable-cause affidavit. Hemmert could reasonably rely "on facts communicated to him by" Investigator Bean as to the similarity of the recovered knife to the knife missing from Andrich's kitchen. *See Carroll v. United States*, 267 U.S. 132, 161, 45 S. Ct. 280, 288 (1925) (internal quotation marks omitted). And Hemmert—if he relied on the recorded interview— had reason to believe that Andrich said "a chef's knife" because "chef's knife" in the 2004 audio recording is preceded by a disputed vocalization that is equally susceptible to interpretation as either an indefinite article ("a") or as a filled pause ("ah").[15] We therefore will not excise this information in the affidavit as a misstatement violative of the Fourth Amendment.

---

[15] "A filled pause is a hesitation, between speaker turns, or within a turn, during which the speaker makes an utterance that is not subject-specific and is not responsive to or encouraging of another's speech. Filled pauses are sometimes words (you know, well, like) and sometimes not (ur, uhm, uh)." Peggy C. Davis, *Contextual Legal Criticism: A Demonstration Exploring Hierarchy and "Feminine" Style*, 66 N.Y.U. L. Rev. 1635, 1665 n.148 (1991).

As to Aguirre's second assertion, Hemmert and the reporting officer, Investigator Bean, had reason to believe in the veracity of Hemmert's statement in the probable-cause affidavit linking the murder weapon to the knife missing from Aguirre's shared residence. Feliciano Sequeida in his police interview with Investigator Bean indicated that Aguirre had access to a knife in their shared residence with a white handle. Feliciano equivocates as to the characteristics of this blade, saying it looks "more or less" like a black-handled blade taken from the restaurant, which itself was "more or less" small and used for cutting vegetables. But Guillermo Espinosa, the cotenant who actually took the knife, explicitly called it a chef's knife in his police interview. And both cotenants claimed the knife was missing for about a week. We can find no support for the proposition that Investigator Bean should have had reason to suspect the veracity of this information. And the search of the residence by Investigator Bean corroborated that the knife was missing.

Between Feliciano's equivocation as to the knife's characteristics, Guillermo's express statement that the knife was a chef's knife, the statements of both that the knife was missing, and Investigator Bean's fruitless search of the residence, both Hemmert and Investigator Bean could reasonably have believed in the veracity of the statement linking the murder weapon to the white-handled knife missing from Aguirre's residence.

In contrast, we do credit as a misstatement the statement in the affidavit about the similarity of the footwear impressions at the

crime scene to Aguirre's shoes.  That is because the investigating officer who reported this information to Hemmert should reasonably have doubted its veracity.  Crime Scene Analyst Christine Craig conducted the analysis of the footwear impressions by comparing them to the impressions of Aguirre's Reebok shoes.  During her investigation, she inspected and photographed Aguirre's shoes. She noted that a stick or piece of vegetation was lodged in the tread of Aguirre's shoe and testified at trial that it was an individual characteristic that could be replicated in footwear impressions left by the shoe.  But the footwear impressions at the crime scene did not reflect such an individual characteristic.  Analyst Craig explained that the absence of replicated individual characteristics foreclosed a conclusion of a positive identification, instead requiring a conclusion of similarity in tread design, size, and shape.

While we have no doubt Analyst Craig believed her conclusion was "true" in a technical sense, we explained in *Paez* that the requirement of "reasonable belief in [the] veracity" of information in an affidavit derives from the Supreme Court's explanation in *Franks v. Delaware* that statements be "'truthful' in the sense that the information put forth is . . . appropriately accepted" as true.  *See Paez*, 915 F.3d at 1286–87 (internal quotation marks omitted) (quoting *Franks*, 438 U.S. at 165, 98 S. Ct. at 2681).  When the source of that information may carry some inherent unreliability, such as an informant's tip, the Court stated that the affidavit must recite the circumstances contextualizing the credibility or reliability of that information.  *See Franks*, 438 U.S. at 165, 98 S. Ct. at 2681.  That principle applies here.  The footwear impression analysis could

only result in a conclusion of similarity—not positive identification—because of the lack of individual characteristics reliably matching the impressions to Aguirre's shoe. The failure to recite any of the particular facts and circumstances adding to or detracting from the reliability of this conclusion, such as the presence of the twig in Aguirre's shoe, deprived the magistrate of his ability "to make an independent evaluation of the matter." *Id.* In that sense, we conclude that Analyst Craig's statement was made with reckless disregard of whether it rendered the affidavit misleading. Accordingly, we agree with Aguirre that the statement in Hemmert's affidavit about the similarity of the footwear impressions to Aguirre's shoes must be excised from our arguable-probable-cause analysis as a misstatement.

2.

We now evaluate Birks and Hemmert's qualified-immunity arguments by curing Hemmert's affidavit of the alleged misstatements and omissions and determining whether arguable probable cause nonetheless existed for Aguirre's seizure for the murders of Cheryl and Bareis. We conclude it does.

First, there is the knife. The affidavit establishes on the basis of multiple officers' observations and the medical examiner's autopsies that Cheryl and Bareis were viciously killed with a sharp instrument that left cuts and sharp force wounds on their bodies. A large Sysco knife with suspected blood was then found in Aguirre's yard, near the fence separating his property from the victims' residence. Aguirre and a cotenant had been employed at a

restaurant that used such a knife, though the restaurant's knife was missing because the cotenant had borrowed it for use in their shared kitchen. And the borrowed Sysco knife was missing from the shared kitchen. So a potential murder weapon was discovered bloodied in Aguirre's yard, with a potential provenance that tightly linked it to Aguirre's workplace and home.

Then, there is the blood evidence. A large amount of blood surrounded the bodies, having spattered even the walls and the doors near each victim. Footwear impressions in suspected blood trailed through the residence. Aguirre admitted to officers that he had the victims' blood on his clothes, which he placed in a plastic bag and tossed onto the roof of his shed (an incriminating act). A search of the bag confirmed that all of Aguirre's clothes—his shorts, T-shirt, and socks—were bloodied. Even underwear located inside Aguirre's residence had blood on it. Aguirre's shoes also had blood on them. Aguirre's clothes and shoes indicated not only his presence at the murder scene, but also that his actions at the scene resulted in blood soaking through his clothes and into his underwear. Such a quantity of blood in his clothing would accord with the events that caused the victims' blood to spatter and pool throughout their residence.

And there is the timing of the murders and Aguirre's conduct that night. At 9:00 AM Van Sandt discovered Cheryl's body, which was cold and stiff to the touch. Because he and Samantha left the residence around 11:30 PM the previous night when both victims were alive, Cheryl and Bareis must have died at some point

during the night or early morning.  Aguirre had been drinking that night, returning to the home of his friend, Salvador, around 2:00 AM.  Salvador stated that Aguirre left between 3:00 and 4:00 AM, but Aguirre placed himself at the murder scene around 6:00 AM.  And when Aguirre spoke to Salvador after the victims were discovered, Aguirre said he did not remember what he had done after leaving Salvador's house in the early morning.  So Aguirre was intoxicated enough that night to not remember if he killed Cheryl and Bareis, and their deaths could have occurred during the early morning hours for which Aguirre could not account and in which he was heavily intoxicated.

Aguirre also had a history of being an unwanted presence in the victims' home.  Both Van Sandt and Samantha reported that Aguirre had entered the residence in the early morning hours uninvited.  Samantha said it had occurred two or three times within the previous two months, and on one occasion Aguirre was discovered standing over Samantha as she slept.  This evidently worried the residents, because Aguirre had to be escorted out of the home and told to not return.  Aguirre fully confirmed Samantha's claims about his nighttime invasions.  Aguirre therefore had a history of consistently accessing the victims' residence during the night even though he was uninvited, acting strangely enough during his entries to warrant being escorted out and told that he was not welcome there.

Finally, the affidavit revealed how Aguirre lied and acted furtively to insulate him from the events at the murder scene.  When

officers initially spoke with Aguirre, he provided a written statement reporting that he was with Salvador until approximately 6 AM, after which he immediately went home to sleep. But it was when the officers asked for his shoes—which had the victims' blood on them—that he admitted that this story was partially fabricated because he feared deportation. He confessed to entering the victims' residence and then hiding most of the evidence of his entry. And immediately after reporting that he knew nothing about the murders, he went to Salvador's home to discuss whether he had any role in the murders. Further, although Aguirre denied walking beyond the front door area of the murder scene, police found footwear impressions leading to Bareis's body, the kitchen, and another bedroom. So Aguirre hid most of the evidence tying him to the crime scene and then knowingly lied to officers, only revealing the truth when he feared being linked to the crimes via his bloody shoes. Although we do not consider any statement directly linking Aguirre's shoes to the footwear impressions, his lies, furtive behavior, bloody shoes, and confessed narrative would imply that Aguirre could be the source of those impressions, but was continuing to lie to avoid prosecution.

Even after removing Birks's positive latent print identification and Analyst Craig's footwear impression conclusion, the affidavit establishes arguable probable cause that Aguirre committed the murders. Arguable probable cause requires only that a reasonable officer in Hemmert's position could have believed that probable cause existed to arrest Aguirre. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007). And probable cause exists when

the totality of circumstances within an officer's knowledge is sufficient to warrant a reasonable belief that the suspect committed a crime. *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992) (citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964)). Probable cause requires "less than evidence which would justify condemnation," *Locke v. United States*, 11 U.S. (7 Cranch) 339, 348 (1813), and "is not a high bar," *Kaley v. United States*, 571 U.S. 320, 338, 134 S. Ct. 1090, 1103 (2014).

When we consider everything Hemmert properly reported in the affidavit, this bar was easily met. Aguirre was linked in multiple ways to the bloody murder weapon. Aguirre was heavily intoxicated that night and could not account for his location at the time when the murders may have happened. When talking with Salvador, Aguirre said he could not even remember whether he had committed the murders. Aguirre had entered the victims' home at night multiple times before, during which he acted in a way that worried the residents. He had blood on his clothes and shoes, with blood even reaching his underwear. He acted furtively after the murders, hiding his bloody clothing, and his shoes were bloody. He immediately lied to officers about his conduct the night of the murders, only admitting that he was at the scene when the officers asked to inspect his shoes. Altogether, Hemmert's affidavit shows he had ample evidence indicating Aguirre's involvement in the murders of Cheryl and Bareis. Hemmert could have reasonably believed that he had probable cause that Aguirre committed the murders.

Even when we add in the allegedly omitted statements, this conclusion does not change. All twelve omissions to which the District Court pointed suggest the possibility of an alternative suspect, Samantha, either acting alone or in conjunction with Van Sandt. But not all the omitted information suggests Samantha or Van Sandt's culpability as strongly as the District Court or Aguirre implied. Samantha's initial lie about her alibi, for example, was immediately and reasonably explained as related to Van Sandt's parents' dislike of her. And while Van Sandt did have serious ongoing trouble with the law, his criminal history consisted not of violence but of sexual offenses involving children and drug possession.

But it is unnecessary to discredit the force of each omission because the suggestion of an alternative suspect does not, on its own, vitiate probable cause. A probable cause determination "does not require the fine resolution of conflicting evidence." *Gerstein v. Pugh*, 420 U.S. 103, 121, 95 S. Ct. 854, 867 (1975) (citation omitted). Nor does a law enforcement officer have an unflagging duty to "investigate independently every claim of innocence" or defense. *See Baker v. McCollan*, 443 U.S. 137, 146, 99 S. Ct. 2689, 2695 (1979). And "the availability of alternative inferences does not prevent a finding of probable cause so long as the inference upon which the officer relies is reasonable." *Cox v. Hainey*, 391 F.3d 25, 32 (1st Cir. 2004). Indeed, probable cause can exist for multiple suspects

simultaneously.[16]  *See, e.g.*, *Maryland v. Pringle*, 540 U.S. 366, 371–72, 124 S. Ct. 795, 800–01 (2003); *accord Lester v. Roberts*, 986 F.3d 599, 611 (6th Cir. 2021) ("Yet just because the police have more than one potential suspect does not mean that they lack probable cause for all of the suspects.").  On its own, "the presence of contradictory evidence does not bar a finding of probable cause."  *Scott v. City of Miami*, 139 F.4th 1267, 1274 (11th Cir. 2025) (citation omitted).  Thus, even accounting for the twelve omissions which suggest Samantha's culpability for the murders, arguable probable cause still existed for Aguirre's arrest for the murders of Cheryl and Bareis.

★          ★          ★

Hemmert's probable-cause affidavit, cured of the alleged misstatements and omissions, nevertheless shows that there was arguable probable cause to detain Aguirre for the murders of Cheryl and Bareis.  Because there was arguable probable cause for Aguirre's arrest, Birks and Hemmert are entitled to qualified immunity as to Aguirre's malicious-prosecution claim.

---

[16] We do not suggest that the existence of evidence that an alternative person committed an offense can never vitiate probable cause.  Probable cause "turn[s] on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S. Ct. 2317, 2329 (1983).  Conflicting evidence may so diminish the probability that a suspect committed the offense so as to vitiate probable cause for the suspect's arrest. *See Scott v. City of Miami*, 139 F.4th 1267, 1274 (11th Cir. 2025) ("Ultimately, probable cause will only be vitiated if the exculpatory evidence did not merely make it less likely probable cause existed but *obviously and irrefutably* established that it didn't exist." (internal quotation marks omitted)).  But that is not the case here.

### C. Count IV

In Count IV, Aguirre claims that Hemmert and Grossi violated his Fourteenth Amendment right to a constitutionally adequate criminal investigation by ignoring exculpatory information, failing to uncover discoverable facts, and investigating in a biased manner. The District Court denied Hemmert and Grossi qualified immunity, determining that the law clearly established that officers must take steps to eliminate doubts about a suspect before arrest and that there are genuine factual questions about whether Hemmert and Grossi acted with deliberate indifference in conducting an insufficient investigation. Hemmert and Grossi dispute the District Court's determination that it was clearly established at a proper level of generality that due process requires an investigation that eliminates doubts and inconsistencies. They also argue that Grossi is entitled to qualified immunity because she engaged in no violative conduct and because there was no clearly established law requiring her to test all evidence found at a crime scene.

We agree with Hemmert and Grossi that no law clearly established Aguirre's right to an investigation that eliminates doubts and inconsistencies in these circumstances. Clearly established law "must not be defined at a high level of generality, but must instead be particularized to the facts of the case." *Fuqua*, 996 F.3d at 1150 (internal quotation marks and citations omitted). The "relevant 'legal rule'" must be sufficiently particularized to the official's action such that "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639–

40, 107 S. Ct. 3034, 3038–39 (1987). The District Court elided this requirement to draw up a generalized legal principle ostensibly from *Tillman v. Coley*, 886 F.2d 317 (11th Cir. 1989), that due process requires investigating officers to eliminate any doubts about a suspect before arrest.

But that is not a proper reading of *Tillman*. *Tillman* established that it was unlawful for an officer to not eliminate doubts about a suspect's identity before obtaining a warrant and arrest, in circumstances where the officer knew facts about the suspect that *actually caused* the officer to harbor significant doubts about the propriety of an arrest. 886 F.2d at 320–21. Indeed, the Court in *Tillman* contrasted the instant circumstances with those of *Baker v. McCollan* to explain that its holding turned on the officer's "own serious doubts regarding the suspect's identity" based on the officer's prior knowledge and not on a general requirement "to investigate every claim of innocence." *Id.* at 321. *Tillman* "is fairly distinguishable from the circumstances" of Aguirre's investigation because Aguirre does not claim that Hemmert and Grossi actually harbored serious doubts about his innocence. *See Vinyard v. Wilson*, 311 F.3d 1340, 1352 (11th Cir. 2002). Instead, Aguirre's complaint alleges that Hemmert and Grossi uncovered threads of evidence that, if pursued to their ends, would have inculpated Samantha despite evidence pointing to Aguirre. We thus must assess whether it was clearly established that Aguirre had a right to an investigation that pursued all potentially exculpatory leads in the face of contrasting inculpatory evidence.

That right was not clearly established at the time of Hemmert and Grossi's investigation in 2004. We cannot locate any decisional law declaring otherwise. Rather, controlling case law declared that "[d]ue process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person." *Patterson v. New York*, 432 U.S. 197, 208, 97 S. Ct. 2139, 2326 (1977). Suspects had no right to "an error-free investigation" of exculpatory leads. *See Baker*, 443 U.S. at 146, 99 S. Ct. at 2695. Certainly, an "arresting officer [was] required to conduct a reasonable investigation to establish probable cause." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (citations omitted). But we delimited the contours of a "reasonable investigation" according to the apparentness of exculpatory information, the ease of obtaining such information, and the accused's pointing-out of such information. *See id.* at 1435–36 (citing *Harris v. Lewis State Bank*, 482 So. 2d 1378, 1382 (Fla. Dist. Ct. App. 1986) ("Where it would appear to a 'cautious man' that further investigation is justified before instituting a proceeding, liability may attach for failure to do so, especially where the information is readily obtainable, or where the accused points out the sources of the information.")). We therefore did not fault an officer for not pursuing multiple lines of evidence to their ultimate exonerative ends when the configuration of apparent evidence yielded an inculpatory character adequate for probable cause for arrest. *See id.* at 1437–43. *See also Mitchell v. McNeil*, 487 F.3d 374, 378 (6th Cir. 2007) ("There is no statutory or common law right, much less a constitutional right, to an investigation."); *Devereaux v. Abbey*, 263 F.3d 1070, 1095 (9th Cir.

2001) ("[T]here is no constitutional due process right . . . to have the investigation carried out in a particular way."); *Brown v. Frey*, 889 F.2d 159, 171 (8th Cir. 1989) ("Brown fails to identify any clearly established constitutional right to an adequate investigation."); *Harris v. Hixon*, 102 F.4th 1120 (11th Cir. 2024) (Tjoflat, J., concurring) ("Whether the officers' investigation was inadequate is irrelevant and has no bearing on either of Harris's Fourth Amendment claims.").

In contrast, we did find constitutional inadequacy in circumstances where the available evidence, uncorroborated by additional evidence or information, on its face actually introduced significant doubts about a suspect's culpability such that resolution of those doubts via further investigation was required. *See Tillman*, 886 F.2d at 320–21; *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (determining an officer erred in relying on an informant's tip that was constitutionally inadequate to support probable cause for an arrest without further investigation, additional inculpatory evidence, or corroborating information). And we concluded that officers have no duty to seek out exculpatory evidence when they are not aware that the evidence exists *and* that it is exculpatory. *See Kelly*, 21 F.3d at 1551 (concluding detectives were not required to seek out exculpatory lab report when they had no actual awareness of its existence). Reviewing the pertinent case law as a whole, we cannot conclude that it was clearly established that Aguirre had a right to an investigation that pursued all potentially exculpatory leads in the face of contrasting evidence that inculpated Aguirre, when the

investigators did not actually harbor significant doubts about Aguirre's culpability.

Because such a duty was not clearly established at the time of Aguirre's investigation, Hemmert and Grossi are entitled to qualified immunity as to Count IV.

### V. State-Law Immunity

Finally, Hemmert and Grossi appeal the District Court's denial to them of state-law immunity under Fla. Stat. § 768.28(9)(a) as to Count VII.  Aguirre in Count VII alleges under Florida law that Hemmert and Grossi intentionally inflicted him with emotional distress.  The District Court denied them immunity because it determined there are factual disputes over whether they acted in bad faith, which is one exception to the immunity statute.  On appeal, Hemmert and Grossi contest the Court's understanding and application of the exceptions to sovereign immunity in § 768.28(9)(a).  "We review *de novo* a district court's summary judgment denial of official immunity."  *Hoyt v. Cooks*, 672 F.3d 972, 981 (11th Cir. 2012) (citations omitted).

Fla. Stat. § 768.28(9)(a) provides:

An officer, employee, or agent of the state or of any of its subdivisions may not be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious

64                    Opinion of the Court                    23-10811

purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

No party to this appeal disputes whether Hemmert and Grossi were acting within the scope of their employment. Instead, the parties contest whether Hemmert and Grossi acted: (1) "in bad faith"; (2) "with malicious purpose"; or (3) "in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a).

When a federal court sits in diversity or pendent jurisdiction, we apply state substantive law. *See Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1259 (11th Cir. 2015). We therefore look to the Florida courts for the definitions of these three statutory phrases. *See Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 710 F.2d 678, 690 (11th Cir. 1983). The Third District Court of Appeal has provided such definitions:

> The phrase "bad faith," as used in section 768.28(9)(a), has been "equated with the actual malice standard." *Parker v. State of Fla. Bd. of Regents ex rel. Fla. State Univ.*, 724 So. 2d 163, 167 (Fla. 1st DCA 1998) (citation omitted).

> The phrase "malicious purpose," as used in section 768.28(9)(a), has been interpreted as meaning the conduct was committed with "ill will, hatred, spite, [or] an evil intent." *Eiras v. Florida*, 239 F. Supp. 3d 1331, 1343 (M.D. Fla. 2017) (citation and internal quotation marks omitted). Or perhaps stated more simply, "the subjective intent to do wrong." *Id.* at 1345 (citation omitted).

> The phrase "wanton and willful disregard of human rights [or] safety," as used in section 768.28(9)(a), has been interpreted as "conduct much more reprehensible and unacceptable than mere intentional conduct," *Richardson v. City of Pompano Beach*, 511 So. 2d 1121, 1123 (Fla. 4th DCA 1987), and "conduct that is worse than gross negligence," *Sierra v. Associated Marine Insts., Inc.*, 850 So. 2d 582, 593 (Fla. 2d DCA 2003) (citation and internal quotation marks omitted).

*Peterson v. Pollack*, 290 So. 3d 102, 109 (Fla. Dist. Ct. App. 2020) (footnote omitted).

In cases where the facts create a genuine dispute as to whether a defendant acted in bad faith, with a malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, summary judgment on the basis of § 768.28(9)(a) is unavailable. *See, e.g.*, *McGhee v. Volusia County*, 679 So. 2d 729, 733 (Fla. 1996); *Dist. Bd. of Trs. v. Martin*, 642 So. 2d 816, 817 (Fla. Dist. Ct. App. 1994) (per curiam); *Ondrey v. Patterson*, 884 So. 2d 50, 54 (Fla. Dist. Ct. App. 2004).

Neither the bad-faith exception nor the malicious-purpose exception applies to Hemmert and Grossi. Aguirre does not forward or point to any evidence on which a "reasonable trier of fact could possibly conclude that" Hemmert and Grossi acted in bad faith or with a malicious purpose. *See Willingham v. City of Orlando*, 929 So. 2d 43, 48 (Fla. Dist. Ct. App. 2006) (citing *Lemay v. Kondrk*, 923 So. 2d 1188, 1191 (Fla. Dist. Ct. App. 2006)). Rather, Aguirre conclusorily states in his complaint that the defendants were

"motivated consciously or unconsciously by their bias against undocumented immigrants from countries in Central America" and that Hemmert and Grossi acted "based on their ethnic bias" when investigating the murders of Cheryl and Bareis. But there is no evidence in the record of such bias or a subjective intent to wrong Aguirre, much less sufficient evidence to create a genuine dispute requiring resolution by the trier of fact.

In contrast, there is sufficient evidence to create a factual dispute over whether Hemmert and Grossi acted with wanton and willful disregard of human rights, property, or safety. Hemmert, the lead investigator, was aware of evidence that pointed to Samantha as a potential suspect: her diagnosis of intermittent explosive disorder, her previous encounters with law enforcement, her historically poor relationship with her mother, her wounded arm, and the fight she had with her mother the night of the murders. But he did not collect her shoes or clothing, question her about her mental health issues, or otherwise investigate her as a serious suspect in the crimes. A trier of fact could reasonably determine that these deficiencies were not just "negligent or foolish," given what Hemmert knew and what he failed to do despite his knowledge.[17]

---

[17] Our denial of qualified immunity here does not implicate our reasoning for granting qualified immunity to Hemmert and Grossi in Count III. For a malicious prosecution claim, the existence of other credible suspects does not erase probable cause to investigate or arrest another suspect. And as we noted, there was sufficient probable cause to arrest Aguirre. Here, however, Hemmert and Grossi's failure to investigate the other credible suspect, Sarah, could possibly constitute acting with wanton and willful disregard of human rights,

23-10811                Opinion of the Court                67

*See Castellano v. Raynor*, 725 So. 2d 1197, 1199 (Fla. Dist. Ct. App. 1999).

The same reasoning applies to Grossi, the lead crime scene analyst.  Grossi did not submit any of the 150 samples of blood evidence from the crime scene for testing, even though she knew it was possible that Cheryl's assailant could wound herself during the course of Cheryl's murder.  And Grossi either missed or did not catalogue in her crime scene report the Sysco boxes at the crime scene and their contents, even after locating a bloody Sysco knife in Aguirre's yard.  Further, a clump of hair was found on Cheryl's body, but no analysis was conducted on any collected hair or fiber.  Nor did Grossi record in her crime scene report whether she or another investigator opened the washing machine at 121 Vagabond Way in search of wet clothes that would corroborate Van Sandt's story for being at the crime scene that morning, even though her notes would have recorded discoveries of value in her search.  A trier of fact could reasonably find that such failures constituted "conduct that is worse than gross negligence" so as to fall within the third exception to sovereign immunity in Fla. Stat. § 768.28(9)(a). *Peterson*, 290 So. 3d at 109 (internal quotation marks omitted).

In coming to this conclusion, we do not determine that Hemmert and Grossi acted wrongly.  We only conclude that, in light of the "difficulty in dividing negligence into degrees," *Ingram*

property, or safety—and therefore granting qualified immunity would be inappropriate.

*v. Pettit*, 340 So. 2d 922, 924 (Fla. 1976) (citations omitted), "a reasonable trier of fact *could possibly* conclude that the conduct was willful and wanton," *Willingham*, 929 So. 2d at 48 (emphasis added) (citing *Lemay*, 923 So. 2d at 1191). Given the alleged deficiencies in Hemmert and Grossi's investigation and competing claims as to the permissibility of those deficiencies, "there is clearly a factual determination to be made as to whether the [officers'] conduct should be characterized as willful and wanton." *See Martin*, 642 So. 2d at 817. For this reason, we cannot conclude as a matter of law that Fla. Stat. § 768.28(9)(a) entitles Hemmert and Grossi to state-law immunity as to Count VII of Aguirre's complaint.

## VI. Conclusion

In summary, we **DISMISS** Aguirre's cross-appeal and **DISMISS IN PART** the cross-appeals of Birks, Hemmert, and Grossi. We **AFFIRM** the District Court's denial to Birks of qualified immunity as to Count I and its denial to Hemmert and Grossi of state-law immunity as to Count VII. But we **REVERSE** the District Court's denial of qualified immunity to Hemmert and Birks as to Count III, and its denial of qualified immunity to Hemmert and Grossi as to Count IV. We **REMAND** for further proceedings.